<u>NOT RECOMMENDED FOR FULL-TEXT PUBLICATION</u>
File Name: 16a0402n.06

Case Nos. 14-3575, 14-3833, 14-3834, 15-3833

## UNITED STATES COURT OF APPEALS
### FOR THE SIXTH CIRCUIT

**FILED**
Jul 15, 2016
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| JIM GIBSON, as next friend of Chloe Gibson; LAURIE GIBSON, as next friend of Chloe Gibson, | ) ) ) ) | |
| Plaintiffs-Appellees/Cross-Appellants, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO |
| v. | ) ) | |
| FOREST HILLS LOCAL SCHOOL DISTRICT BOARD OF EDUCATION, | ) ) ) | |
| Defendant-Appellant/Cross-Appellee. | ) | |

BEFORE: BOGGS, SUTTON, and STRANCH, Circuit Judges.

BOGGS, Circuit Judge. The Individuals with Disabilities Education Act requires participating states to provide a "free and appropriate public education" ("FAPE") to school-aged children who have disabilities. At issue in these consolidated appeals is whether the Forest Hills Local School District ("Forest Hills") provided a FAPE to Chloe Gibson, now a twenty-four-year-old Ohio resident who attended Forest Hills schools as a child and teenager. The district court held that Forest Hills denied Chloe a FAPE by failing to adequately plan for her postsecondary future. The court ordered injunctive relief and awarded the Gibsons $327,641 in attorney's fees. Both parties appealed. For the reasons given below, we affirm the district court's judgment, vacate its fee awards, and remand this case for further proceedings.

I

A

The Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400–1482, offers state governments federal funding to help educate children with disabilities. *Id.* § 1411(a)(1). In exchange for those funds, participating states must adopt policies and procedures that implement the Act's promise of making a FAPE available to every eligible child. *Id.* § 1412(a)(1)(A). Like every state in this circuit, Ohio has opted to receive IDEA funds. *Bd. of Educ. of Austintown Local Sch. Dist. v. Mahoning Cty. Bd. of Mental Retardation & Developmental Disabilities*, 613 N.E.2d 167, 172 (Ohio 1993).

The lynchpin of the IDEA is a document known as the "individualized educational program" ("IEP"). *Honig v. Doe*, 484 U.S. 305, 311–12 (1988). Every year, an "IEP Team" comprising an eligible child's parents, her teachers, a representative of the local educational agency, and, whenever appropriate, the child herself, meets to discuss the child's progress and educational goals. 20 U.S.C. § 1414(c)(1), (d)(1)(A)–(B), (d)(4)(A); Ohio Admin. Code 3301-51-07(I)(1), (L)(2)(a). The product of these meetings is the IEP, a document that evaluates the child's academic achievement and functional performance, as well as her short-term and long-term goals. 20 U.S.C. § 1414(d)(1)(A)(i)(I)–(II), (d)(3)(B); Ohio Admin. Code 3301-51-07(H)(1)(b)–(c). The IEP also specifies the services that the school will provide to help the child to accomplish her goals, and sets forth the criteria that the IEP Team will use to evaluate the child's progress over the course of the coming year. 20 U.S.C. § 1414(d)(1)(A)(i)(III)–(IV); Ohio Admin. Code 3301-51-07(H)(1)(c)–(d).

In order to ensure that every child with a disability is equipped with "the skills and knowledge necessary to enable" her "to lead [a] productive, independent, adult li[fe], to the

maximum extent possible," the IDEA also requires the IEP Team to plan for the child's transition into adult life outside of the school system. *Deal v. Hamilton Cty. Bd. of Educ.*, 392 F.3d 840, 864 (6th Cir. 2004) (quoting 20 U.S.C. § 1400(a)(5)(E)). By the time a child is sixteen years old, her IEPs must set "postsecondary goals" based on "age appropriate transition assessments related to training, education, employment, and, where appropriate, independent living skills." 20 U.S.C. § 1414(d)(1)(A)(i)(VIII)(aa); *accord* Ohio Admin. Code 3301-51-07(H)(2)(a)–(b). The IEPs must also list the "transition services" that the school district will provide to help the child achieve those transition-related goals. 20 U.S.C. § 1414(d)(1)(A)(i)(VIII)(bb); Ohio Admin. Code 3301-51-07(H)(2)(c).

When a school district falls short of these obligations, parties may enforce the IDEA in federal court. 20 U.S.C. § 1415(i)(2); Ohio Admin. Code 3301-51-05(K)(17)(a). To ease the burden on families, the IDEA also allows courts to award attorney's fees to any "prevailing party" who is the parent of a child with a disability. 20 U.S.C. § 1415(i)(3)(B)(i)(I). But because federal courts are "generalists with no expertise in the educational needs" of students who have disabilities, the IDEA requires participating states to provide an impartial "due process hearing" to any parent who believes his child has not received a FAPE, and makes the exhaustion of that remedy a prerequisite for review in federal court. *Fry v. Napoleon Cmty. Sch.*, 788 F.3d 622, 626 (6th Cir. 2015) (quoting *Crocker v. Tenn. Secondary Sch. Athletic Ass'n*, 873 F.2d 933, 935 (6th Cir. 1989)); *see* 20 U.S.C. § 1415(f), (i)(2)(A); Ohio Admin. Code 3301-51-05(K)(17)(a).

Like many states, Ohio has created a two-stage procedure for resolving IDEA disputes. If an aggrieved party files a complaint, the Ohio Department of Education appoints an "impartial hearing officer" ("IHO"), a neutral arbiter with both legal training and familiarity with the IDEA

and attendant state and federal regulations, to adjudicate the dispute. Ohio Admin. Code 3301-51-05(K)(10)(c)(i). After receiving evidence and compiling a record, the IHO renders a decision as to whether the school district has denied the pupil a FAPE. *Id.* 3301-51-05(K)(10)–(13). Any party who is dissatisfied with the IHO's decision may file an appeal with the Ohio Department of Education, which then appoints another neutral arbiter called a "state level review officer" ("SLRO") to review the record and issue an independent decision on the merits. *Id.* 3301-51-05(K)(14)(b). A party who is aggrieved by the SLRO's decision may then bring a civil action in federal district court. *Id.* 3301-51-05(K)(17)(a).

With this legal framework in mind, we turn to the facts of the dispute before us.

B

In 1998, Jim and Laurie Gibson enrolled their daughter, Chloe, in first grade in the Forest Hills Local School District, an Ohio school district that is subject to the requirements of the IDEA. Chloe has a developmental disability that has adversely impacted her motor skills and causes her to experience adaptive and cognitive delays. A seizure disorder, which hampered Chloe's development during much of her childhood, has compounded the impact of this disability. Chloe's disability and seizure disorder have left her with an IQ of between forty-three and fifty-seven, and have given her difficulty with simple math and reasoning tasks, such as counting and telling time. Despite these setbacks, Chloe has learned to read at a third-grade level, and has also shown an ability to learn basic routines and complete repetitive tasks, such as bussing tables and unpacking boxes. In short, although Chloe's disability poses challenges for her daily life, she has made significant progress in overcoming them.

The challenges posed by Chloe's disability were more pronounced when Chloe was a child, and as she approached middle school, the Gibsons and Forest Hills began to disagree about

what Chloe's disability meant for her future. Observing that Chloe remained dependent on others for safety, support, and prompting, Forest Hills's staff contemplated that Chloe would move on to a "recreational/leisure" setting after leaving the public school system, and promoted an educational program that focused on improving Chloe's functional life skills. The Gibsons, however, hoped that Chloe would ultimately find competitive work and began to worry that Forest Hills's "functional" approach would deprive their daughter of an opportunity to "develop some basic employability skills." Appellees/Cross-Appellants Second Br. 7.

The disagreement began to strain the Gibsons' relationship with Forest Hills when Chloe graduated from middle school. Though Chloe had made substantial progress in elementary and middle school, where her education focused on improving basic life skills, such as personal care, food preparation, and communication, her progress was inconsistent. As a consequence, Forest Hills sought to place Chloe in Anderson High School, where she would learn in a multidisabilities classroom and focus on improving those basic living skills. The Gibsons, on the other hand, wanted Chloe to study at Turpin High School, where she would enroll in a program "designed for students with disabilities who have the capability to obtain and maintain competitive employment and live independently on their own." Appellant/Cross-Appellee First Br. 8 n.4. When Forest Hills ignored the Gibsons' wishes and placed Chloe at Anderson High School, the parties' relationship "deteriorated rapidly." *Id.* at 8.

While Forest Hills and the Gibsons wrangled over Chloe's future, Chloe made progress at Anderson High School, where she improved her behavior and motor, communications, and reading skills. But Chloe continued to struggle in other areas, such as problem solving and personal care, and remained dependent on others for prompting and safety. The Gibsons focused on Chloe's progress and faulted Forest Hills for failing to provide Chloe with IEP goals that

would enable her to transition into the workplace. Forest Hills, however, believed that Chloe was not ready for such advanced goals and continued to insist that she was better suited for a future in a nonvocational adult program.

After a series of "numerous long IEP [Team] meetings," the Gibsons finally gave up on Forest Hills, contacted the Ohio Department of Education, and filed a written request for a due-process hearing. The Gibsons complained that Forest Hills had failed to fulfill its IDEA obligations in more than twenty ways, including the district's failure to provide Chloe with adequate math and reading IEP goals, an appropriate vocational assessment, or an adequate IEP transition plan. The Gibsons also complained that Forest Hills had failed to consider Chloe's transition-related goals, interests, and preferences when devising IEPs.

While the matter was pending before the IHO, Forest Hills and the Gibsons agreed that Goodwill Industries would conduct a vocational assessment of Chloe's job-related abilities. A job coach assessed Chloe while she unpacked boxes at a local department store, bussed tables at a restaurant, and collected shopping carts from a parking lot. The assessment was mixed, showing that while Chloe had a positive attitude, responded to prompts, and was able to follow routines, she also required constant supervision, took a long time to complete basic tasks, and lacked awareness of safety.

The IHO considered this and other evidence at a twenty-six-day hearing and concluded that Forest Hills had denied Chloe a FAPE by failing to provide her with adequate reading and math goals and programming, and ordered Forest Hills to provide Chloe with a total of 480 hours of compensatory math and reading education. However, the IHO agreed with Forest Hills that Chloe "will not be living independently" after leaving Forest Hills and, with this in mind, concluded that Forest Hills's transition planning had been adequate. The IHO also rejected the

Gibsons' remaining claims that Forest Hills had denied Chloe a FAPE. Notwithstanding her conclusion that Forest Hills had denied Chloe a FAPE, the IHO declined to rule that the Gibsons were prevailing parties entitled to attorney's fees, explaining that the Gibsons "bear some of the responsibility for [Forest Hills's] difficulty in creating an IEP and providing services to Chloe."

"[H]oping to effect closure of its disputes with the Gibsons," Forest Hills declined to appeal the IHO's decision. *Id.* at 9. The Gibsons apparently felt otherwise and filed an appeal with the Ohio Department of Education, which then appointed an SLRO to review the hearing record. Once before the SLRO, the Gibsons argued that the IHO had erred in six ways, including her failure to find that Forest Hills's transition-related assessments and services were inadequate and her conclusion that the Gibsons were not prevailing parties entitled to attorney's fees. Even though Forest Hills declined to file its own appeal, it argued that the IHO erred when she concluded that Forest Hills had not provided Chloe with adequate reading and math goals and programming.

The SLRO affirmed the IHO in relevant part. The SLRO rejected all of the Gibsons' claims and held that, reading and math goals aside, Forest Hills had provided Chloe a FAPE. The SLRO concluded that Forest Hills had provided adequate transition services to Chloe, explaining that in light of the severity of Chloe's disability, the IEP Team's transition planning and services satisfied the IDEA. The SLRO stated that the "evidence does not support the conclusion that transition planning should incorporate a plan for [Chloe] to engage in competitive work" because such goals would be "beyond her capability." The SLRO also held that the IHO's "decision not to find that [the Gibsons] were prevailing parties [was] well within her province." Despite having rejected all of the Gibsons' claims on appeal, the SLRO did not reverse the IHO's order requiring Forest Hills to provide Chloe with compensatory math and

reading education, reasoning that Forest Hills had forfeited its claim by "cho[osing] not to appeal the IHO['s] decision."

C

While the SLRO was considering the Gibsons' appeal, the Gibsons came to federal court, alleging that they were prevailing parties who could collect attorney's fees. After the SLRO issued her decision, Forest Hills then filed a separate federal action against the Gibsons, asserting that the SLRO erred when she declined to reverse the IHO's ruling as it pertained to Chloe's math and reading education. The Gibsons responded with a motion to dismiss, arguing that Forest Hills's failure to appeal the IHO's decision meant that it had failed to exhaust administrative remedies. In addition, the Gibsons filed five counterclaims against Forest Hills, asserting, inter alia, that Forest Hills failed to properly plan for Chloe's transition into adult life. The Gibsons also repeated their claim for attorney's fees.

After consolidating the two cases, the district court granted the Gibsons' motion and dismissed Forest Hills's complaint on the ground that Forest Hills had failed to exhaust administrative remedies. *Gibson v. Forest Hills Local Sch. Dist., Bd. of Educ.*, No. 1:11-CV-329, 2012 WL 1197896, at *4–6 (S.D. Ohio Apr. 10, 2012). Turning to the Gibsons' various counterclaims, the court reviewed and "verified" the SLRO's findings of fact. *Gibson v. Forest Hills Sch. Dist. Bd. of Educ.*, No. 1:11-CV-329, 2013 WL 2618588, at *2–11 (S.D. Ohio June 11, 2013). The district court then rejected four of the Gibsons' counterclaims, reasoning that in most respects, the SLRO correctly concluded that Forest Hills had provided Chloe with a FAPE. *Id.* at *16–17, *19–28. But with respect to transition planning, the district court held that Forest Hills had failed to comply with three of the IDEA's transition-related procedural requirements, and concluded that these failures denied Chloe a FAPE. *Id.* at *17–19.

In particular, the district court found that Forest Hills never invited Chloe to transition-related meetings, in violation of federal and Ohio regulations. *Id.* at \*18. The court found that Forest Hills compounded this error by failing to take other steps to consider Chloe's transition-related preferences and interests, as required by 34 C.F.R. § 300.321(b)(2) and Ohio Admin. Code 3301-51-07(I)(2)(b). *Gibson*, 2013 WL 2618588, at \*18. The court also found that until Goodwill Industries conducted its vocational assessment, at which time Chloe was nineteen years old, Forest Hills had failed to conduct any age-appropriate assessments related to Chloe's transition into adult life. *Id.* at \*19. The court concluded that without information about Chloe's preferences, interests, or abilities, Forest Hills could not properly plan for Chloe's transition and therefore denied her a FAPE. *Id.* at \*19 & n.6.

In order to remedy Forest Hills's failures, the court ordered the school district to provide Chloe with 425 hours of transition-related services. *Gibson v. Forest Hills Sch. Dist. Bd. of Educ.*, No. 1:11-CV-329, 2014 WL 533392, at \*8 (S.D. Ohio Feb. 11, 2014). In light of the Gibsons' success in the litigation, the district court also concluded that the Gibsons were prevailing parties and awarded them $300,000 of the $800,314.50 that they requested in attorney's fees, which the court later augmented by $27,641.25 to compensate them for litigating the fee award and opposing a postjudgment motion filed by Forest Hills. *Gibson v. Forest Hills Sch. Dist. Bd. of Educ.*, No. 1:11-CV-329, 2015 WL 3999507, at \*1 (S.D. Ohio July 1, 2015); *Gibson v. Forest Hills Sch. Dist. Bd. of Educ.*, No. 1:11-CV-329, 2014 WL 3530708, at \*1, \*6 (S.D. Ohio July 15, 2014).

Both parties appealed. Forest Hills appealed the district court's dismissal of its complaint against the Gibsons, arguing that it did in fact exhaust administrative remedies. Forest Hills also appealed the district court's order requiring it to provide additional transition-related services to

Chloe. For their part, the Gibsons appealed the district court's attorney's-fee awards, which they contend are inadequate. We address each appeal in turn.

## II

We start with the district court's dismissal of Forest Hills's complaint. Forest Hills appeals that decision and argues that under Ohio law, a party need not file a notice of appeal in order to properly present an argument to the SLRO. As we explain, we disagree.

## A

Before addressing the merits of Forest Hills's claim, some jurisdictional housekeeping is in order. The Gibsons moved to dismiss Forest Hills's complaint under Federal Rule of Civil Procedure 12(b)(1), alleging that Forest Hills's failure to exhaust administrative remedies deprived the district court of subject-matter jurisdiction. Though the IDEA does require litigants to exhaust state administrative remedies before filing a federal action, *see* 20 U.S.C. § 1415(f), (i)(2)(A), the Supreme Court has cautioned that "[n]ot all mandatory [prefiling] 'prescriptions, however emphatic, are . . . properly typed jurisdictional,'" *Union Pac. R.R. Co. v. Bhd. of Locomotive Eng'rs & Trainmen Gen. Comm., Cent. Region*, 558 U.S. 67, 81 (2009) (third alteration in original) (quoting *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 511 (2006)). As other courts have observed, such warnings suggest that Rule 12(b)(1) is not an appropriate avenue for dismissing an IDEA complaint for failure to exhaust. *See, e.g*, *Mosely v. Bd. of Educ. of City of Chi.*, 434 F.3d 527, 532–33 (7th Cir. 2006).

In light of this authority, we have lately broken with our own precedent and implied that the IDEA's exhaustion requirement is not jurisdictional in nature. *Compare Doe ex rel. Doe v. Dublin City Sch. Dist.*, 453 F. App'x 606, 609 (6th Cir. 2011) (observing with approval a school district's decision to "rais[e] the [parents'] failure to exhaust administrative remedies as an

affirmative defense"), *with Metro. Bd. of Pub. Educ. v. Guest*, 193 F.3d 457, 463 (6th Cir. 1999) (holding that "the district court exceeded its jurisdiction to the extent that it . . . rule[d] upon issues beyond those presented to the ALJ"). Other circuits have divided on the question. *Compare Payne v. Peninsula Sch. Dist.*, 653 F.3d 863, 867–71 (9th Cir. 2011) (holding that a failure to exhaust administrative remedies is an affirmative defense rather than a jurisdictional prerequisite), *overruled on other grounds by Albino v. Baca*, 747 F.3d 1162 (9th Cir. 2014) (en banc), *Mosely*, 434 F.3d at 532–33 (same), *and N.B. ex rel. D.G. v. Alachua Cty. Sch. Bd.*, 84 F.3d 1376, 1379 (11th Cir. 1996) (same), *with Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 245 (2d Cir. 2008) (holding that a failure to exhaust administrative remedies is a jurisdictional prerequisite), *MM ex rel. DM v. Sch. Dist. of Greenville Cty.*, 303 F.3d 523, 536 (4th Cir. 2002) (same), *and Cudjoe v. Indep. Sch. Dist. No. 12*, 297 F.3d 1058, 1063 (10th Cir. 2002) (same).

Observing this split in authority, the district court analyzed the Gibsons' motion under both Rule 12(b)(1) and Rule 12(b)(6), which allows civil defendants to move to dismiss a complaint for failure to state a claim upon which the district court can grant relief. The district court's dual analysis obviates any need for us to clarify which side of the split we are on. Because the district court dismissed Forest Hills's complaint without prejudice, and had an independent basis for jurisdiction over the Gibsons' various counterclaims, it makes little difference that the court relied on Rule 12(b)(6) as an alternative ground for its dismissal of Forest Hills's complaint. *See Rengo Co. v. Molins Mach. Co., Inc.*, 657 F.2d 535, 539 (3d Cir. 1981) ("[A] jurisdictional defect in the complaint will not preclude adjudication of a counterclaim over which the court has an independent basis of jurisdiction.").

Nor does the district court's reliance on Rule 12(b)(6) meaningfully alter our standard of review. We review de novo a district court's dismissal under both Rule 12(b)(1) and Rule 12(b)(6). *Stew Farm, Ltd. v. Nat. Res. Conservation Serv.*, 767 F.3d 554, 558 (6th Cir. 2014). What we do with disputed facts does ordinarily depend upon which rule is invoked. Where, as here, the district court has "inquire[d] into the factual predicates for jurisdiction" to resolve a Rule 12(b)(1) motion, we review the district court's factual findings for clear error. *Howard v. Whitbeck*, 382 F.3d 633, 636 (6th Cir. 2004). By contrast, when reviewing a Rule 12(b)(6) motion, the district court accepts the allegations in the plaintiff's complaint as true and so must we. *Bowman v. United States*, 564 F.3d 765, 769 (6th Cir. 2008). But the distinction makes no difference in this case, where the parties do not dispute the district court's exhaustion-related factual findings. Our independent review of the legal significance of those facts leads us to agree with the district court that Forest Hills's decision to forego an appeal of the IHO's decision means that it has not exhausted administrative remedies.

B

As we have already mentioned, the IDEA requires aggrieved parties to exhaust administrative remedies before bringing their disputes to federal court. 20 U.S.C. § 1415(f), (i)(2)(A); Ohio Admin. Code 3301-51-05(K)(17)(a). This does not mean that the courthouse door is open simply because administrative remedies are no longer available. *See Woodford v. Ngo*, 548 U.S. 81, 89–91 (2006). Instead, parties "exhaust" state administrative remedies only when they properly present their claims to the relevant state administrative agency. *See Children's Ctr. for Developmental Enrichment v. Machle*, 612 F.3d 518, 522 (6th Cir. 2010). The reason is simple: Exhaustion not only "enables the agency to develop a factual record" and "apply its expertise," but also allows an agency "to correct its own mistakes," thereby

"promoting accuracy, efficiency, agency autonomy, and judicial economy." *Donoho ex rel. Kemp v. Smith Cty. Bd. of Educ.*, 21 F. App'x 293, 296 (6th Cir. 2001) (quoting *Christopher W. v. Portsmouth Sch. Comm.*, 877 F.2d 1089, 1094 (1st Cir. 1989)). These benefits are particularly valuable where the question touches on a traditional state and local function in which we have little expertise, such as primary and secondary education. *See Burilovich v. Bd. of Educ. of Lincoln Consol. Sch.*, 208 F.3d 560, 567 (6th Cir. 2000).

There is no doubt that Forest Hills presented its arguments to the SLRO. The question is whether it did so properly. To answer this question, we look to state IDEA procedures. *See E.L. ex rel. Lorsson v. Chapel Hill-Carrboro Bd. of Educ.*, 773 F.3d 509, 515–16 (4th Cir. 2014). Ohio regulatory law states that any party aggrieved by the IHO's "findings and decision" may appeal to an SLRO by filing a written notice with the Ohio Department of Education. Ohio Admin. Code 3301-51-05(K)(14)(b)(i). That notice must "set forth the order appealed and the grounds of the party's appeal." *Id.* 3301-51-05(K)(14)(b)(i)(*a*). Forest Hills admits that it never filed such a notice. But, Forest Hills explains, its failure to do so is irrelevant because Ohio regulations require the SLRO to "[e]xamine the entire hearing record" and "[m]ake an independent decision on completion of the review." *Id.* 3301-51-05(K)(14)(b)(iii)(*a*), (*e*). According to Forest Hills, this duty to examine the "entire" record and make an "independent" decision obligates the SLRO to consider any and all arguments raised by the parties in their briefs, irrespective of whether they filed a notice of appeal.

Forest Hills's reading of the regulation renders superfluous the regulation's mandatory requirement that a party's notice of appeal identify not only the "order appealed," but also the particular "grounds of the party's appeal." *Id.* 3301-51-05(K)(14)(b)(i)(*a*). That notice requirement, which serves to ensure that the parties, the Ohio Department of Education, and the

SLRO are all aware of which issues are in dispute, would make little sense if the parties could ignore it and raise any and all issues in their briefing. The surplusage is a problem because we must try to "avoid [any] construction which renders a provision meaningless or inoperative." *Boley v. Goodyear Tire & Rubber Co.*, 929 N.E.2d 448, 452 (Ohio 2010) (quoting *State ex rel. Myers v. Spencer Twp. Rural Sch. Dist. Bd. of Educ.*, 116 N.E. 516, 517 (Ohio 1917)). More sensibly read, the Ohio regulation simply obligates the SLRO to "[e]xamine the entire hearing record" with respect to those claims raised in an aggrieved party's notice of appeal. Ohio Admin. Code 3301-51-05(K)(14)(b)(iii)(*a*). And the SLRO's obligation to make an "independent decision" says nothing about the breadth of her review, but rather clarifies that the SLRO owes no deference to the IHO's conclusions. *Id.* 3301-51-05(K)(14)(b)(iii)(*e*).

Our reading not only pays heed to well-established principles of statutory construction, but also puts us in good company. In *E.L. ex rel. Lorsson v. Chapel Hill-Carrboro Board of Education*, 773 F.3d 509 (4th Cir. 2014), the Fourth Circuit considered whether a student had failed to exhaust state administrative remedies by declining to file a notice of appeal with the North Carolina Department of Public Instruction. *Id.* at 515. Like Ohio, North Carolina has a two-level administrative process for resolving IDEA disputes, and provides that any party "aggrieved by the findings and decision of a hearing officer" may seek review by filing a written notice of appeal with the state's Department of Public Instruction. N.C. Gen. Stat. § 115C-109.9(a). Like Forest Hills, the aggrieved student in *E.L.* chose not to file a notice of appeal with the state agency. *E.L.*, 773 F.3d at 515. The Fourth Circuit squarely rejected the student's claim that she had exhausted administrative remedies by presenting arguments to North Carolina's SLRO after the school district appealed, explaining that "[b]ecause E.L. failed to *properly* take

an appeal, there was nothing for the review officer to consider as to E.L.'s claims." *Id.* at 516

(emphasis added).

The Middle District of Pennsylvania has come to the same conclusion under

Pennsylvania's two-tiered system of IDEA review. *See Kristi H. ex rel. Virginia H. v. Tri-Valley*

*Sch. Dist.*, 107 F. Supp. 2d 628, 632 (M.D. Pa. 2000) ("[N]othing in the law requires the Appeals

Panel to address [issues] that were not appealed. That is, the Appeals Panel is not bound to

address the three school years which were not appealed, and administrative remedies are not

exhausted with respect to those years.").

Forest Hills contends that our holding is inconsistent with two cases, namely, *Bougades*

*v. Pine Plains Central School District*, 376 F. App'x 95 (2d Cir. 2010), and *E.N. v. Special*

*School District No. 1*, 603 N.W.2d 344 (Minn. Ct. App. 1999). Neither case is on point. In

*Bougades*, the Second Circuit explained that because parents had challenged the "substantive

adequacy" of their son's IEP at both levels of New York's administrative review, they had

exhausted administrative remedies. *Bougades*, 376 F. App'x at 96. Unlike Forest Hills,

however, the parents in *Bougades* filed a timely appeal of the IHO's decision, making it

unnecessary for the Second Circuit to consider the question that Forest Hills presents here. *See*

Plaintiffs' Motion for Summary Judgment at 17, *Bougades v. Pine Plains Cent. Sch. Dist.*, 2009

WL 2603110 (S.D.N.Y. Aug. 25, 2009) (No. 1:05-CV-02861); Defendant's Rule 56.1 Statement

at 3, *Bougades*, 2009 WL 2603110 (No. 1:05-CV-02861). In *E.N.*, the Minnesota Court of

Appeals ruled that a Minnesota SLRO had jurisdiction to consider arguments raised by both

parties even though only one party had filed a timely notice of appeal. *E.N.*, 603 N.W.2d at 349.

But the question whether state law *prohibits* an SLRO from considering forfeited arguments, at

issue in *E.N.*, is quite different from the question whether state law *requires* an SLRO to consider forfeited arguments, at issue here.

The most sensible reading of the Ohio regulation requires an aggrieved party to file a notice of appeal with the Ohio Department of Education if the party wishes to preserve objections to an IHO's decision. If the SLRO does not exercise whatever discretion she may have to consider an appellee's forfeited argument, a party's failure to file such a notice means that the party has not exhausted administrative remedies. This reading of the regulation not only fulfills our obligation to give meaning to each and every part of a regulation, *see Myers*, 116 N.E. at 517, but also ensures that the parties, the Ohio Department of Education, and the SLRO have ample opportunity to correct any of the IHO's mistakes, *see Donoho*, 21 F. App'x at 296. In short, Forest Hills took a calculated risk when it chose not to appeal the IHO's ruling, "hoping to effect closure of its disputes with the Gibsons." Appellant/Cross-Appellee First Br. 9. That the risk materialized does not excuse the school district from complying with state procedural requirements. *See Woodford*, 548 U.S. at 90. For these reasons, the district court properly dismissed Forest Hills's complaint.

III

Having dispensed with Forest Hills's complaint, we turn to its dispute with the district court's conclusion that the school district's inadequate transition planning denied Chloe a FAPE. The district court held that Forest Hills denied Chloe a FAPE by violating three of the IDEA's procedural requirements. As we explain, we agree. We begin by clarifying what the Gibsons must show in order to prove entitlement to relief, as well as the standard that governs our review.

A

The IDEA endeavors to provide children with disabilities a FAPE that is "designed to meet their unique needs." *Deal*, 392 F.3d at 853. To this end, Congress has required states to develop various procedural safeguards that not only set forth minimum requirements for IEPs, but also ensure that parents and guardians are given a full opportunity to participate in the design of those IEPs. *See* 28 U.S.C. § 1415(a)–(b); *Doe ex rel. Doe v. Defendant I*, 898 F.2d 1186, 1190 (6th Cir. 1990). The "importance [that] Congress attached to these procedural safeguards cannot be gainsaid," as they are a result of a "legislative conviction that adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 205–06 (1982)

Because of this legislative emphasis on procedure, judicial review in an IDEA case has two components. A court must first determine whether a school system has complied with procedures set forth by the IDEA and implementing regulations. *Deal*, 392 F.3d at 853. If the school system has complied with all procedural requirements, the court must then examine the relevant IEPs created through those procedures and ascertain whether they were "reasonably calculated to enable the child to receive educational benefits." *Ibid.* If so, "the State has complied with the obligations imposed by Congress and the courts can require no more." *Rowley*, 458 U.S. at 207. But a complainant is not automatically entitled to relief merely because a school district violated the IDEA's procedural requirements: "Only if a procedural violation has resulted in substantive harm, and thus constitutes a denial of a FAPE, may relief be granted." *Deal*, 392 F.3d at 854. The party challenging an IEP—in this case the Gibsons—bears the

burden of proving by a preponderance of the evidence that the IEP was defective and led to the denial of a FAPE. *Ibid.*

The standard that governs our review is more nuanced. When reviewing a state administrative decision in an IDEA case, federal courts must make an "independent decisio[n]" on the merits. *Rowley*, 458 U.S. at 205 (quoting S. Rep. No. 94-455, at 50 (1975) (Conf. Rep.)). But because the IDEA provides that reviewing courts "shall receive the record of the [state] administrative proceedings," *ibid.* (alteration in original) (quoting 20 U.S.C. § 1415(e)(2)(C)), we must give "due weight" to the findings and conclusions of the last state officer or panel to review an IDEA complaint, *id.* at 206; *see Knable ex rel. Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 764 (6th Cir. 2001); *Thomas v. Cincinnati Bd. of Educ.*, 918 F.2d 618, 624 (6th Cir. 1990). The strength of the "due weight" owed to state administrative conclusions depends upon the extent to which the administrative decision hinges on "matters for which educational expertise is relevant." *McLaughlin v. Holt Pub. Sch. Bd. of Educ.*, 320 F.3d 663, 669 (6th Cir. 2003).

We have distilled this broad guidance into a requirement that district courts review IDEA cases under a "modified de novo standard." *N.L. ex rel. Ms. C. v. Knox Cty. Sch.*, 315 F.3d 688, 692 (6th Cir. 2003). On "modified de novo" review, district courts must make findings of fact based on a preponderance of evidence, while refraining from setting aside any administrative findings unless "the evidence before the court is more likely than not to preclude the administrative decision from being justified based on the agency's presumed educational expertise, a fair estimate of the worth of the testimony, or both." *N.W. ex rel. J.W. v. Boone Cty. Bd. of Educ.*, 763 F.3d 611, 614 (6th Cir. 2014) (quoting *Bd. of Educ. of Fayette Cty. v. L.M.*, 478 F.3d 307, 312–13 (6th Cir. 2007)). On appeal, we must accept the district court's findings of

fact unless they are "clearly erroneous." *Knable*, 238 F.3d at 764. We review de novo any conclusions of law and any mixed questions of law and fact, including whether a school district has denied a student a FAPE. *Ibid.* In reviewing the district court's decision, we must accord the SLRO's decision the same "due weight" that the district court must. *Deal*, 392 F.3d at 850.

B

The district court held that Forest Hills violated the IDEA's procedural requirements in three ways: by failing to invite Chloe to participate in IEP Team meetings, failing to take other meaningful steps to ensure that her transition-related interests were considered, and failing to conduct any age-appropriate transition assessments. Applying the above-described standard of review, we address each alleged procedural violation in turn.

1

Both parties agree that Forest Hills never invited Chloe to any of her IEP Team meetings. Both also agree that the school district did not notify the Gibsons that their daughter would be welcome at such meetings if she wanted to attend. The Gibsons argue, and the district court held, that these failures amounted to a violation of the IDEA's procedural requirements because Forest Hills had a legal obligation to invite Chloe to transition-related IEP Team meetings. *Gibson*, 2013 WL 2618588, at *17–18. We agree.

Paragraph (b)(1) of 34 C.F.R. § 300.321, a Department of Education ("DOE") regulation that outlines the IEP Team's transition-related obligations, provides:

> In accordance with [P]aragraph (a)(7) of this section, the public agency must invite a child with a disability to attend the child's IEP Team meeting if a purpose of the meeting will be the consideration of the postsecondary goals for the child and the transition services needed to assist the child . . . .

34 C.F.R. § 300.321(b)(1). Paragraph (b)(1)'s mandatory language requiring school districts to invite a child to transition-related IEP Team meetings is dispositive of the question here. Words

19

such as "must" ordinarily "creat[e] an obligation impervious to . . . discretion," *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998), and any construction of Paragraph (b)(1) that gives school districts the option to decline to invite a child to transition-related IEP Team meetings is thus inconsistent with the clear import of Paragraph (b)(1)'s plain language.

Forest Hills protests that Paragraph (b)(1)'s prefatory reference to Paragraph (a)(7) muddies the waters. Paragraph (a)(7) of 34 C.F.R. § 300.321 requires school districts to "ensure" that a child is "include[d]" as part of her IEP Team "[w]henever appropriate." 34 C.F.R. § 300.321(a)(7). According to Forest Hills, the canon against surplusage requires us to read the phrase "In accordance with [P]aragraph (a)(7)" as qualifying Paragraph (b)(1)'s obligation to invite a child to transition-related IEP Team meetings, such that the obligation applies only when it would be "appropriate" to include the child on her IEP Team. But Forest Hills's own reading of Paragraph (b)(1) creates more surplusage than it avoids: If Paragraph (b)(1) requires a school district to invite a student to her IEP Team meetings only when the school district must ensure that she is included on the IEP Team, the whole of Paragraph (b)(1) is superfluous because it requires nothing that Paragraph (a)(7) does not.

Our reading of Paragraph (b)(1) not only avoids such an odd result, but is also consistent with DOE's own interpretation. In a policy statement published in the *Federal Register*, DOE expressed its view that the permissive language in Paragraph (a)(7) in no way qualifies the mandatory language of Paragraph (b)(1):

> These two provisions are not redundant. Section 300.321(a)(7) requires the public agency to include the child with a disability when appropriate, . . . and, thus, provides discretion for the parent and the public agency to determine when it is appropriate to include the child in the IEP Team meeting. Section 300.321(b), on the other hand, requires a public agency to invite a child to attend an IEP Team meeting when the purpose of the meeting will be . . . transition . . . . The

> Department believes it is important for a child with a disability to participate in determining the child's postsecondary goals and for the IEP Team to consider the child's preferences and interests in determining those goals.

Assistance to States for the Education of Children with Disabilities, 71 Fed. Reg. 46,540, 46,672 (2006). In short, irrespective of whether or not it is appropriate to include a child as part of her IEP Team, the plain language of Paragraph (b)(1) gives school districts an obligation to invite that child to IEP Team meetings when transition is on the agenda.

Because the relevant text of the analogous Ohio regulation is identical to that of 34 C.F.R. § 300.321, *see* Ohio Admin. Code 3301-51-07(I)(1)(g), (I)(2)(a)—and in any event may not relieve Forest Hills of a federal-law obligation, *see Doe ex rel. Doe v. Bd. of Educ. of Tullahoma City Sch.*, 9 F.3d 455, 457 (6th Cir. 1993)—Forest Hills had a duty to invite Chloe to transition-related IEP Team meetings. And because it is undisputed that the school district failed to fulfill that duty, the district court correctly concluded that Forest Hills violated this procedural requirement of the IDEA.

2

The district court held that Forest Hills's failure to invite Chloe to transition-related IEP Team meetings was compounded by another procedural violation, namely, Forest Hills's failure to take meaningful steps to ascertain Chloe's transition-related preferences. Ignoring a student's transition-related preferences not only demeans the individual whose future is likely to be shaped by transition planning, but also reduces the likelihood that an IEP Team will design an optimal transition program for a child with a disability. *See* Paula D. Kohler & Sharon Field, *Transition-Focused Education*, 37 J. Special Educ. 174, 180 (2003); *see also* Assistance to States for the Education of Children with Disabilities, 62 Fed. Reg. 55,026, 55,125 (1997). For this reason, both federal and Ohio law provide that if a child does not attend her transition-related IEP Team

meetings, the school district "must take other steps to ensure that the child's preferences and interests are considered." 34 C.F.R. § 300.321(b)(2); *accord* Ohio Admin. Code 3301-51-07(I)(2)(b). On the record before us, we agree with the district court that Forest Hills did not fully comply with this procedural requirement either.

The record does suggest that Forest Hills took some steps to gather information about Chloe's interests and preferences. In May 2008, Forest Hills's psychologist compiled information about the kinds of activities Chloe enjoyed by interviewing the Gibsons and observing Chloe at home and in the classroom. In December 2009, days before Chloe turned nineteen, Cheryl Henkel, a Forest Hills work-study coordinator, undertook an informal assessment of Chloe's interests, which involved showing Chloe cards depicting various activities and asking her which she was interested in doing. The next summer, Marvel Slaughter, a social worker, sat down with Chloe to ask questions about activities that she liked, and those that she disliked. Later in 2010, Jack Darland, a transition specialist, observed Chloe as she performed various jobs.

However, the district court found that these steps were not sufficient to allow Forest Hills to draw conclusions about how Chloe might want her future to look. The court explained that Forest Hills had exposed Chloe to so few job-related activities that its informal assessments could shed but little light on her transition-related preferences. *Gibson*, 2013 WL 2618588, at *18. On the record before us, we cannot conclude that the district court's finding is clearly erroneous.

As the district court observed, "[a]t school, Chloe engaged in the same type of work-related activities in the classroom year after year[,] . . . for example, stapling, shredding documents, folding napkins, emptying the dishwasher, wiping tables, stuffing envelopes, [and]

pushing a cart," thereby "reducing the value" of informal assessments conducted at school. *Ibid.* The record also suggests that Forest Hills could have done far more outside of the classroom. For example, Betsy Ryan, Forest Hills's special-education coordinator, testified that Forest Hills staff could have taken Chloe to shadow or assist workers in different jobs. *Ibid.* Forest Hills could also have conducted assessments like Slaughter's and Darland's far earlier than it did. Though the SLRO and the district court both found that Chloe would not be "able to cognitively understand the concept of transition to life beyond school," *id.* at *11, there is ample evidence that an observer would nonetheless be able to tell which tasks Chloe enjoyed and which she did not, supporting the district court's conclusion that more assessments would have been helpful.

If Forest Hills's efforts could not properly apprise Chloe's IEP Team of her transition-related preferences and interests, the IEP Team could not have "ensure[d]" that those "preferences and interests [were] considered" when devising Chloe's IEPs. 34 C.F.R. § 300.321(b)(2); Ohio Admin. Code 3301-51-07(I)(2)(b). Tellingly, in the section of her IEPs left for "[f]amily and student preferences and interests," Chloe's IEP Team made no mention of Chloe's preferences and interests, instead focusing on those of her parents. We thus agree with the district court that Forest Hills's failure to invite Chloe to IEP Team meetings was aggravated by yet another procedural violation, namely, the school district's failure to take steps that would "ensure" that Chloe's transition-related preferences and interests were considered during transition planning.

3

Nor did Forest Hills comply with the third procedural requirement at issue in this case—Forest Hills's obligation to provide Chloe with measurable postsecondary goals based on age-appropriate transition assessments. As we have mentioned, once a child has reached the age of

23

sixteen, the child's IEP Team must use her transition-related preferences to devise a transition plan. *See* 34 C.F.R. § 300.320(b). That plan "must" include "[a]ppropriate measurable postsecondary goals" in areas such as training, education, and employment. *Id.* § 300.320(b)(1). These goals must in turn be based on "age appropriate transition assessments" of the child's current and future capabilities. *Ibid.* To ensure that these goals are realized, the IDEA also requires the IEP Team to list the services that the school district will provide to help the child accomplish them. *Id.* § 300.320(b)(2). Ohio law adopts this basic framework and adds that the age-appropriate transition assessments must not simply relate to employment, but rather "employment in a competitive environment in which workers are integrated regardless of disability." Ohio Rev. Code § 3323.011(H)(2). As the word "must" suggests, all of these requirements are mandatory. *See, e.g.*, *Rolland v. Romney*, 318 F.3d 42, 55 (1st Cir. 2003); *State ex rel. Dworken v. Court of Common Pleas of Cuyahoga Cty.*, 1 N.E.2d 138, 139 (Ohio 1936). Nonetheless, Forest Hills appears to have ignored them for years.

Forest Hills did not conduct any transition-related assessments until 2009, when Chloe was eighteen years old. That year, Forest Hills convened an "Evaluation Team" comprising Forest Hills's psychologist, Chloe's special-education teacher, an occupational therapist, a physical therapist, and a speech pathologist, to assess Chloe's progress. Though the resulting report did comment on Chloe's ability to perform various work-related tasks that she had honed in the classroom, Forest Hills convened the Evaluation Team in order to reevaluate Chloe's ongoing eligibility for special education, not her readiness for transition. Given this focus, the Evaluation Team did not direct its efforts toward evaluating Chloe's preparedness for work after school and certainly did not assess Chloe's skills or potential relative to "employment in a competitive environment in which workers are integrated regardless of disability." Ohio Rev.

24

Code § 3323.011(H)(2). Only after Chloe turned nineteen did Forest Hills begin to take more meaningful action by asking Jack Darland to conduct his assessment of Chloe in various workplaces, and by agreeing to have Goodwill Industries conduct on-the-job assessments of Chloe's skills. This left a full three years of time during which Forest Hills was in default of its obligation to conduct age-appropriate transition assessments.

Without any such assessments, Chloe's IEP Team apparently had insufficient information from which to devise "measurable postsecondary goals" or list the services that Forest Hills would provide to help Chloe accomplish those goals. Chloe's IEP for the 2007–2008 school year, for example, does not include any postsecondary educational or training goals at all. The one employment-related goal that is included disavows the possibility that Chloe will ever undertake employment in an integrated setting and simply states: "Supportive Work Environment—Non-Competitive Work." As for the activities and services that would help Chloe accomplish that vague goal, the IEP provides: "Participate in in-school work-based learning experiences w[ith] supervision and support." None of this says anything about the employment-related skills Chloe is to develop or what kind of work, competitive or otherwise, she might undertake after leaving high school. Chloe's IEP Team also left entirely blank a portion of the IEP that invites a "statement of transition service needs that focus on the student's courses of study during his/her secondary school experiences." Though the transition portion of Chloe's 2007–2008 IEP does cross-reference several of Chloe's non-transition-related goals, these annual goals focus on Chloe's short-term development, instead of the longer-term view that a successful transition plan must have.

Nor do Chloe's later IEPs fare much better. Chloe's 2008–2009 IEP includes the same nebulous employment goal, which the IEP again follows by cross-referencing short-term goals

that do little to elaborate on the IEP Team's vision for Chloe's future in a "Supportive Work Environment" doing "Non-Competitive Work." Chloe's 2009–2010 IEP is more comprehensive, but provides no greater detail about what Chloe is to accomplish and how. That IEP has some additional transition-related goals and does mention some transition-specific services and activities that Forest Hills was to provide. But nothing is truly measurable about the goals, which include vague statements such as "Chloe will participate in a supported/assisted adult program." Chloe was to achieve this "goal" by simply doing the same activities she was already doing in the classroom on a daily basis, including participating in "[f]unctional living tasks," "[w]ork-based tasks," "[s]elf-care activities," and "[f]unctional reading tasks." Perhaps most telling is the IEP's concluding remark that "[t]he IEP Team will need to discuss and further develop Chloe's transition plan for post-secondary outcomes."

In sum, our review of the record leads us to agree with the district court that Forest Hills did not conduct age-appropriate transition assessments of Chloe in a timely fashion, leaving Forest Hills unable to create measurable postsecondary goals for Chloe. The IEP goals that Forest Hills did design appear to have foreclosed the possibility that Chloe would undertake any postsecondary employment, and said little about Chloe's postsecondary education or training. This dual failure amounted to a third procedural violation of state and federal law.

C

Our holding that Forest Hills failed to comply with three of the IDEA's procedural requirements does not end our inquiry. Under our precedent, a procedural violation of the IDEA does not result in a denial of a FAPE unless a child or parent can prove that the "procedural violation has resulted in substantive harm." *Deal*, 392 F.3d at 854. Substantive harm occurs when a procedural violation seriously infringes upon a party's participation in the IEP process, or

when a defect in an IEP "result[s] in the loss of educational opportunity." *Knable*, 238 F.3d at 766. After independently reviewing the record, we agree with the district court that Forest Hills's failure to consider Chloe's transition-related preferences or conduct age-appropriate transition assessments resulted in a loss of educational opportunity that denied Chloe a FAPE.

As an initial matter, however, we harbor doubts about whether Chloe would actually have attended IEP Team meetings even had she been invited. The SLRO found that Chloe's IEP Team meetings were highly contentious and dominated by an "us vs. them" relationship between the Gibsons and Forest Hills. Chloe's special-education teacher testified that with her IEP Team "yelling and slamming doors," attending IEP Team meetings "would have been a frightening experience for [Chloe]." A Forest Hills psychologist gave a similar account, as did Chloe's mother, who even testified that she would have preferred that Chloe not attend the confrontational meetings. But even assuming that Chloe would have attended, it is doubtful that she would have been able to articulate her views in such a formal setting because the SLRO and the district court both found that Chloe "is unlikely . . . [to be able] to express her preferences and desires for her future" in a direct manner. *Gibson*, 2013 WL 2618588, at \*11. Standing alone, then, Forest Hills's failure to invite Chloe to transition-related IEP Team meetings would not have denied Chloe a FAPE.

But the same cannot be said of Forest Hills's other two procedural violations. In concluding that these violations "resulted in substantive harm and a denial of [a] FAPE," the district court did not take a position on what it described as "the parties' differing visions for Chloe's future." *Id.* at \*19 n.6. Instead, the district court focused on what it saw as a lost opportunity to further develop Chloe's potential for supported employment in a community setting. In finding that Chloe might have taken advantage of a more ambitious transition plan,

27

the district court drew upon Goodwill Industries's report that "although Chloe was 'not able to meet competitive standards for quality and pace,' she did show 'a willingness to learn and to try new things,'" which led the job coach to recommend further "site specific, extended Community Based Assessments that would allow for Chloe to fully identify interests, assess stamina over time, [and] allow the team to see if repetition [of tasks] would improve [the] pace and quality'" of Chloe's work. *Id.* at *19. In other words, even though Chloe was unable to perform competitive work during the assessment, the district court found that with further task-specific training and evaluation, Chloe might have been able to perform supported employment. *Ibid.*

Taking this finding into consideration, we cannot conclude that Forest Hills's procedural violations were harmless. We have held that a "loss of educational opportunity" is a denial of a FAPE. *Knable*, 238 F.3d at 766. Though we have not previously confronted the "harmlessness" of a failure to fully consider a child's transition preferences or conduct age-appropriate transition assessments, we struggle to see how ignoring the possibility that Chloe could be capable of work in a supported setting did not result in a "loss of educational opportunity," and other courts have found substantive harm on similar facts. *See Carrie I. ex rel. Greg I. v. Dep't of Educ.*, 869 F. Supp. 2d 1225, 1247 (D. Haw. 2012) ("The lack of assessments alone is enough to constitute a lost educational opportunity."); *Dracut Sch. Comm. v. Bureau of Spec. Educ. Appeals*, 737 F. Supp. 2d 35, 51 (D. Mass. 2010) (finding substantive harm where student "operated without meaningful assessments for most of the two year period in question and [was] never provided appropriate, measurable goals"); *Marple Newtown Sch. Dist. v. Rafael N.*, No. 07-0558, 2007 WL 2458076, at *11 (E.D. Pa. Aug. 23, 2007) (finding substantive harm where IEP's "generic goals . . . remained static from year to year" and did not "take into account Student's strengths or preferences"). Though we are aware that a failure to abide by transition-related requirements

28

may not result in substantive harm where the record shows that a student "was not in a position to benefit from [a more] elaborate transition plan," *Bd. of Educ. of Twp. High Sch. Dist. No. 211 v. Ross*, 486 F.3d 267, 276 (7th Cir. 2007), the district court, citing the Goodwill Industries report, found that it was possible that Chloe could have benefitted from more extensive transition planning. Because ample evidence supported the district court's finding, we accept it for purposes of our review.

In holding that Forest Hills denied Chloe a FAPE, we do not suggest that Chloe derived no benefit from her education at Forest Hills. By nearly all accounts, Chloe improved her skills while she was a student at Anderson High School. When she entered high school, Chloe was aggressive and resisted working. *Gibson*, 2013 WL 2618588, at *7. She had difficulty using both hands and had trouble with interacting with others and switching between tasks. But during her time at AHS, Chloe's motor skills and speech improved, and she gained the ability to read basic words and sentences. *Id.* at *9, *11. Chloe learned to control her behavior, had less trouble switching between tasks, and gained some basic math skills. *Ibid.* By the time of her 2010 Goodwill Industries vocational assessment, Chloe showed an "ability to adapt to new environments, places[,] and people" and "demonstrated positive progress when presented with the opportunity to learn new vocational skills." In sum, Chloe "made significant progress in transitioning, functional independence, daily living skills and community skills" during her time at Forest Hills. *Id.* at *11.

But Chloe's progress at Forest Hills does not negate the possibility that adherence to IDEA procedures would have enabled Forest Hills to design a work-oriented educational plan that would have allowed Chloe to be more self-sufficient than she was at the time of the due-

process complaint. For this reason, we agree with the district court that Forest Hills denied Chloe a FAPE.

IV

Having resolved Forest Hills's appeals in the Gibsons' favor, we turn to the Gibsons' appeal of the district court's fee awards. We review a district court's decision to award attorney's fees in an IDEA case for abuse of discretion, using the principles established for fee awards in federal civil-rights actions. *Phelan v. Bell*, 8 F.3d 369, 373 (6th Cir. 1993). Those principles require any attorney's-fee awards to be "reasonable," *Gonter v. Hunt Valve Co.*, 510 F.3d 610, 616 (6th Cir. 2007), which is the case so long as the fee award is "adequately compensatory to attract competent counsel yet" not so high as to "produc[e] a windfall for lawyers," *ibid.* (quoting *Geier v. Sundquist*, 372 F.3d 784, 791 (6th Cir. 2004)).

In calculating "reasonable" attorney's fees, district courts often compare a fee request to what is known as the "lodestar" value—"the number of hours worked multiplied by the prevailing hourly rates." *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 546 (2010). There is a strong presumption that the lodestar method yields a "reasonable" fee award, though district courts may choose to adjust the resulting value if "the lodestar does not adequately take into account" a relevant factor, *id.* at 554, such as the degree of success obtained, *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983). Though we accord substantial deference to the district court's calculation of, and departure from, a lodestar value, our deference is not without limit. *Gonter*, 510 F.3d at 616. Importantly, in order for us to meaningfully review fee awards, district courts using a lodestar calculation as a starting point for a fee award must provide specific explanations of the various factors that motivated any upward or downward departure from that calculation. *Perdue*, 559 U.S. at 557–59.

The Gibsons initially moved for attorney's fees in the amount of $800,314.50, a figure they compiled by taking the product of the hourly rates of each of their attorneys and paralegals and the number of hours that each attorney and paralegal worked. *Gibson*, 2014 WL 3530708, at *5–6. The district court undertook a lodestar calculation using average hourly rates of attorneys and paralegals in the Southern District of Ohio and found that the Gibsons' request of $800,314.50 approximated the resulting lodestar value. *Id.* at *6.

But after mentioning various considerations, including its finding that both the Gibsons and Forest Hills had contributed to the "protracted nature of this litigation," the district court ultimately decided to reduce the Gibsons' fee award by 62.5% to $300,000 on the ground that the "success achieved by the Gibsons was limited in proportion to the total relief requested." *Ibid.* The court also "f[ound] that an award of . . . $300,000 is reasonable to have enabled the Gibsons to attract competent legal counsel, but not provide a windfall to [counsel] for achieving partial success." *Ibid.* In response to Forest Hills's objection that some entries on the Gibsons' attorneys' billing reports were vague or duplicative, the court explained that its "across-the-board reduction . . . is [also] sufficient to remedy any problems with vague or duplicative entries," as well as the "other equitable factors" at issue. *Id.* at *7, *9.

The district court's observation about the Gibsons' overall level of success accurately describes the record and appears to reflect a reasoned judgment that we hesitate to disturb. *See, e.g.*, *Hensley*, 461 U.S. at 436 (observing that "[t]here is no precise rule or formula for making [fee] determinations," the "range of possible success is vast," and the fact that a plaintiff is a "'prevailing party' . . . may say little about whether the expenditure of counsel's time was reasonable in relation to the success achieved"). In this case, the Gibsons brought numerous claims before the IHO, the SLRO, and the district court, and sought various forms of relief that

31

included money damages, Chloe's placement in a different school or program, new IEP goals for social skills, communications skills, problem-solving skills, leisure and recreation skills, vocational skills, and writing skills, as well as a declaration that Forest Hills denied Chloe a FAPE in as many areas. Moreover, the district court appears not to have considered the Gibsons' success mechanically or arbitrarily, and instead based its reduction on a substantive evaluation of the reality that the hours of remedial education the Gibsons won were but a small part of the broad and diverse relief that they sought. *See Gibson*, 2014 WL 3530708, at *9.

However, the district court's discussion of this admittedly complex case makes it somewhat difficult to understand precisely which factors the court actually did consider when assigning a fee award of $300,000 and how much weight it attached to each. Among those factors that the district court clearly did consider, such as the Gibsons' limited success and Forest Hills's allegations of overbilling, the district court declined to explain how much each motivated the 62.5% reduction and why. Additionally, in light of its statement that both parties contributed to the "protracted nature" of the litigation, the district court's opaque reference to "other equitable factors" leaves unclear which party's fault, if any, the district court considered. *Id.* at *6–7. We are also somewhat unsure of whether the district court considered the Gibsons' success in the state administrative proceedings when computing the downward departure: At one point, the district court stated that "the Gibsons achieved significant, but limited, success on behalf of Chloe," recognizing that the IHO awarded Chloe "compensatory educational services in [reading and math]." *Id.* at *8. But the court later wrote that "the Gibsons had not established that Chloe's IEPs were inadequate to provide her with [a] FAPE in any respect except to transition services." *Id.* at *9.

We do not suggest that the district court's fee award was ultimately unreasonable, or that the district court should be faulted for its assessment in this complex case. But binding authority required the district court to more clearly explain which factors motivated its decision to depart from the lodestar calculation and how much each contributed. In *Binta B. ex rel. S.A. v. Gordon*, 710 F.3d 608 (6th Cir. 2013), for example, we explained that "[i]t is essential that the judge provide a reasonably specific explanation for all aspects of a fee determination." *Id.* at 639. In that case, the defendants had requested a 43.5% reduction in a lodestar calculation for the plaintiffs because the defendants had won some modifications to an earlier consent decree that was favorable to the plaintiffs. *Ibid.* The district court ultimately decided that a 20% reduction was appropriate, explaining that "defendants were largely successful in their efforts to modify the [earlier] decree, but that the success was also limited by plaintiffs' efforts." *Id.* at 640. Because the court's explanation did "not demonstrate why the court settled on 20%, as opposed to 43.5% or 60% or 70%," we vacated the award and remanded the matter, instructing the district court to provide a more thorough explanation of precisely what factors influenced its downward departure and by how much. *Ibid.*

Just as the district court in *Binta B.*, the district court in this case did not clarify which factors it actually did consider and left somewhat unclear why it chose a 62.5% reduction instead of, say, 52.5% or 72.5%. For this reason, we must vacate the district court's fee award and remand for further proceedings. Because the district court's fees-on-fees award was calculated as a percentage of the fee award, we vacate the fees-on-fees award as well.

V

Our review of the record in this case leaves us with the firm belief that Forest Hills's staff and the Gibsons care deeply about Chloe's education and future, and that both parties have

sought to do what they believe is in Chloe's best interest. Having accepted the district court's findings of fact, however, we agree that Forest Hills failed to comply with the IDEA's procedural requirements, and that these procedural violations ultimately denied Chloe a FAPE. But because the district court did not adequately explain the reasons for departing from its lodestar calculation, we must vacate the court's fee awards and remand those awards for further consideration. For these reasons, we AFFIRM the judgment of the district court, VACATE the district court's orders concerning attorney's fees, and REMAND this case for further proceedings consistent with this opinion.