ALAN D. ALBRIGHT, UNITED STATES DISTRICT JUDGE
Before the Court is Defendants' Motion for Judgment on the Administrative Record (Document No. 49), Plaintiffs' Motion for Summary Judgment (Document No. 49), Plaintiffs' Response to Defendants' Motion (Document No. 62), Defendants' Response to Plaintiffs' Motion (Document No. 61), Defendants' Reply (Document No. 66), and Plaintiffs' Reply (Document No. 65). After carefully reviewing the Parties' briefs and the relevant law, the Court has decided that Defendants' Motion for Judgment on the Administrative Record should *577 be granted, and Plaintiffs' Motion for Summary Judgment should be denied for the reasons set forth below.
I. Background
In 2014, J.M. met eligibility for special education services as a student with Other Health Impairment ("OHI") based on Attention Deficit Hyperactivity Disorder ("ADHD") and as a student with a Specific Learning Disability ("SLD") in the areas of basic reading and reading comprehension. Respondent's Exhibit 3.[1] Riesel Independent School District (the "District") added "co-occurring dyslexia" to the SLD classification on the basis of a July 24, 2014 private evaluation, which identified J.M. as a student with dyslexia. R. 38. J.M.'s Admission Review and Dismissal ("ARD") committee met on June 2, 2016 to review J.M.'s educational program, discuss his schedule for the upcoming 2016-17 school year, conduct transition planning, review the decision of the hearing officer in a prior case involving J.M., consider J.M.'s needs for Extended School Year ("ESY") services, and discuss upcoming summer evaluations. Joint Exhibit 1, at 21, 25.[2] J.M.'s parents attended the ARD meeting. Id. at 21. J.M. was invited to the ARD meeting but did not attend. Id. The June 2016 ARD committee meeting addressed J.M.'s present levels of academic achievement and functional performance ("PLAAFP") in the following areas: physical, behavioral, discipline, functional, and academic. Id. at 2.
At the June 2016 ARD committee meeting, it was discussed that J.M. did not meet the state standard on the State of Texas Assessments of Academic Readiness ("STAAR") for End of Course ("EOC") exams for Biology, Algebra I, and English I. Id. at 21. The STAAR tests are based on the Texas Essential Knowledge and Skills ("TEKS"), which is the state mandated curriculum. Administrative Record at 13.[3] The TEKS contains the content and skills students need to learn in order to make academic progress from year to year and to succeed post-graduation. Id. Students in Texas must pass the STAAR EOC exams in Algebra I, English I and II, Biology, and U.S. History to graduate high school. Id. The ARD agreed J.M. would take the summer 2016 administration of the STAAR tests-those results were to be reviewed at the ARD committee meeting scheduled prior to the beginning of the 2016-17 school year. J.1 at 21.
Transition services and planning were discussed prior to the June 2016 meeting. Id. The transition plan addressed J.M.'s post-graduation plans, parental involvement, postsecondary options, and J.M.'s employment/independent goals and objectives. Id. at 8, 21. The June 2016 transition plan included measurable post-secondary goals in the following areas: training, education, employment, and transition services. Id. at 8.[4] J.M.'s measurable post-secondary goals were as follows: (1) Training: "[u]pon graduation from high school, [J.M.] will enroll in an institution of higher learning to pursue training in the field of welding"; (2) Education: "[u]pon graduation from high school, [J.M.] will enroll in an institution of higher learning to pursue a welding certification"; and (3) Employment: "[u]pon completion of certification/degree, [J.M.] will seek to obtain employment in order to live independently *578 and support himself financially." Id. J.M.'s plan referred to his Schedule of Service in his Individualized Education Plan ("IEP") as the set of transition of services that would help him attain his measurable post-secondary goals. Id.
The ARD committee formulated the aforementioned goals based on functional vocational evaluations conducted by the District that included J.M., his mother, and one of his teachers. Id. J.M. expressed an interest in studying welding at a college or technical/trade school. Id. at 9. J.M. had previously held a job performing manual labor-moving trash and hauling hay-and sometimes performed chores. Id. J.M. was active in school and in the community and had numerous hobbies. Id. J.M.'s mother confirmed that he had previously held a job, expressed a desire to learn a skill or trade, and wished to attend college or technical/trade school. Id. at 11. J.M.'s mother also expressed she did not want J.M. to take vocational or career education classes. Id. After conducting these evaluations, the District provided J.M.'s parents with information from local colleges, the Texas Department of Assistive and Rehabilitative Services, and a college preparation checklist. Id. at 8.
At the June 2016 meeting, the ARD committee proposed conducting evaluations for math achievement and speech in order to collect more information to determine J.M.'s needs. J.2 at 1. J.M.'s mother consented to the proposed assessments. Id. The ARD committee also discussed the passing standards required to participate in the Universal Intercollegiate League ("UIL") extracurricular activities. In the ninth grade, J.M. was not allowed to participate in an event at the county fair because of his failing grades. J.1 at 25. The District agreed to contact the UIL to determine whether the ARD committee could modify eligibility standards in response to J.M.'s mother's inquiry. Id.
The ARD committee confirmed that J.M. was under the care of a physician because of his Crohn's disease at the June 2016 meeting. J.1 at 2. The ARD committee provided J.M.'s mother with another OHI form to consider adding Crohn's disease to J.M.'s OHI eligibility. Id. The ARD committee also reviewed an Individualized Healthcare Plan ("IHP"), which addressed J.M.'s medical needs related to Crohn's disease. Id. at 2-5. J.M.'s teachers reviewed the IHP with the school nurse-the nurse was available to any teacher or staff who needed clarification on the IHP. Id. at 2. J.M.'s mother also provided the ARD committee with a list of recommended accommodations related to J.M.'s medical condition. Id. These proposed recommendations were to be reviewed and considered at the August 2016 ARD meeting before the start of the 2016-17 school year. Id.
The June 2016 ARD documents included a Prior Written Notice ("PWN") page explaining the decisions of the ARD, the basis for those decisions, the options considered and why they were rejected or not, the evaluation procedures, tests, records, and reports used as the basis for their decisions, and any other relevant factors that were considered when making their decisions. Id. at 25-26. The PWN included a procedural safeguards statement with the name and phone number of the Co-Op Directors as the parental contact for questions or other information to assist J.M.'s parents in understanding the procedural safeguards. Id. at 26.
The District completed a Full Individual Evaluation ("FIE") about two weeks after the June 2, 2016 ARD meeting. J.3 at 1. The purpose of the June 2016 FIE was to conduct testing in the areas of math and articulation. Id. The FIE was conducted by a speech/language pathologist and an educational diagnosticiation-a special education *579 and general education teacher were also members of the FIE multi-disciplinary team. Id. The FIE was conducted in English, which is J.M.'s primary language. Id. The assessment instruments used were: (i) selected and administered so as not to be discriminatory; (ii) administered in the form most likely to yield accurate information as to J.M.'s academic, developmental, and functional performance; (iii) used for the purposes of which they were valid and reasonable; (iv) administered by trained and knowledgeable personnel; and (v) administered in accordance with instructions by the assessments' producers. Id. at 6. These instruments were also tailored to assess J.M.'s specific areas of educational need in math and speech/language and selected and administered to accurately reflect J.M.'s aptitude or achievement level. Id. J.M. was assessed in all areas of suspected disability identified by the June 2016 ARD. Id. at 1-6.
The June 2016 FIE showed that J.M.'s receptive and expressive language, pragmatic language, articulation, voice, and fluency were age appropriate. Id. at 4. J.M. scored below what was expected for his age on the math component of the June 2016 FIE. Id. However, this was likely because he was prohibited from using a calculator on the test, and J.M. was accustomed to using a calculator for math on a daily basis. Id.[5] The June 2016 FIE confirmed J.M.'s continued eligibility for special education as a student with OHI and a SLD in basic reading skills and reading comprehension. Id. at 5-6. However, the June 2016 FIE also found that J.M. no longer met eligibility criteria as a student with a Speech Impairment ("SI") because his articulation and speech/language skills were age appropriate. Id. at 6.
The District provided J.M. with dyslexia compensatory services in the summer of 2016. R.32 at 2. The dyslexia teacher implemented the Dyslexia Intervention Program ("DIP"). Id. at 1. The teacher was trained in the DIP and qualified to teach students with dyslexia in Texas. A.R. at 3802. J.M. was cooperative in his sessions and willingly did what he was told to do. Id. at 3824-25. Although J.M. struggled with letter sounds and decoding at the start of the summer, he showed improvement in these skills by the end of the summer. Id.
J.M.'s ARD committee convened on August 18, 2016. J.4 at 1. At parental request, the District sent a set of proposed IEPs for the 2016-17 school year to J.M,'s parents on August 17, 2016. R.6 at 1. Two ARD meeting notices were also sent to J.M.'s parents-the notices identified the purposes of the ARD, the set of evaluation procedures, and the test records and reports to be reviewed and discussed. J.4 at 25-27. The purpose of the August 2016 ARD was to review the results of the summer 2016 testing and review proposed IEPs for the 2016-17 school year. Id. at 22. J.M.'s parents attended the meeting. Id. The ARD committee found that the June 2016 FIE confirmed J.M.'s eligibility for special education. Id. However, J.M.'s parents disagreed with the FIE's conclusion that their son no longer needed speech services. Id. 24.
The ARD committee proposed measurable annual IEP goals and objectives for the 2016-17 school year-these included goals and objectives for English, Math, Dyslexia Services, and Behavior. Id. at 3-11.
*580 A PLAAFP statement was included for each set of goals and objectives. Id. The ARD committee reviewed J.M.'s STARR results, report cards, and teachers' input in developing the PLAAFPs for the English, Math, and behavior goals. Id. at 3, 5, 9-10. The ARD committee reviewed the results of testing conducted in February 2014 and March 2016 in developing J.M.'s dyslexia goals. Id. at 7. The IEP also included accommodations J.M. needed in each of his classes to accomplish his goals and objectives. Id. at 9. The ARD committee also included an IHP that related to medical issues that might arise at school related to J.M.'s Crohn's disease, including a list of medical accommodations. Id. at 12-16. The IHP and its accommodations were shared with the school nurse and reviewed with J.M.'s teachers. Id. at 12-13.
The ARD committee finalized J.M.'s class schedule for his tenth grade year at the August 2016 meeting. R.8 at 9, 48. He was placed in all general education classes with instruction provided by a general education teacher and by a dyslexia specialist in the Dyslexia class. Id. J.M. was also placed in an Advisory class and was to be provided 15 minutes of special education consult once every six weeks. J.4 at 17, 19, 24. The ARD committee also readdressed J.M.'s mother's inquiry regarding participation in UIL activities and agreed to modify the passing grade standard in core academic classes so that J.M. could participate in UIL activities. Id. at 24. The IEP discussed and reviewed at this August 2016 meeting was implemented during the 2016-17 school year. Id. at 17.
A PWN was included in the August 2016 ARD documents. The PWN included a description of the ARD decisions, why those decisions were made, the options considered and why they were or were not rejected, the evaluation procedures, tests, records, or reports used as the basis for their decisions, and any other relevant factors that were considered when making their decisions. Id. at 24. The PWN included a procedural safeguard statements statement with the name and phone number of the Co-Op director as the parental contact for questions or more information to assist J.M.'s parents in understanding the procedural safeguards. Id.
The District assigned Tammy Bush, a special education teacher, to serve as J.M.'s case manager during the 2016-17 school year. A.R. at 3893-95. Ms. Bush was responsible for preparing portions of J.M.'s IEP and the ARD paperwork, monitoring his progress in classes, and communicating with his teachers. Id. Ms. Bush also provided the special education consult services for the 2016-17 school year. Id. at 3895. In providing such services, Ms. Bush consulted with J.M.'s teachers either in person or by e-mail. Id. Ms. Bush did not believe a change in the level of consult services in J.M.'s IEP was needed because the allotted time for consult services was sufficient to monitor J.M.'s progress in his classes. Id. at 3920-22. Ms. Bush also measured J.M.'s progress towards meeting IEP goals by conferring with teachers, observing him in the classroom, and reviewing teacher gradebooks. Id. at 3896-99, 3931-35. Ms. Bush would follow up with J.M.'s teachers if she needed more information. Id. at 3899. Ms. Bush also served as J.M.'s advisory teacher during the 2016-17 school year. Id. at 3893-95.
The District also provided J.M. with one-on-one compensatory dyslexia services during the 2016-17 school year. Id. at 3826-27. The services were provided by the same teacher who provided the compensatory dyslexia services during the summer of 2016. Id. at 3817. The services were provided in two sessions-one in the morning and one in the afternoon. Id. at 3825-26. The afternoon session was omitted following a discussion and subsequent *581 agreement between J.M.'s mother and the high school principal. Id. at 3828-31. J.M. also received dyslexia reading instruction during the school day in addition to his one-on-one compensatory dyslexia services. Id. However, it became confusing with one teacher beginning a lesson and the other teacher attempting to pick up where the former left off; therefore, the teachers adjusted how they would teach J.M. Id. They decided that the teacher providing the compensatory dyslexia services would reinforce the concepts and lessons taught in the dyslexia class using material from high school textbooks or current events from a website. Id. J.M.'s ability to decode words independently improved by the end of the 2016-17 school year. Id. at 3833-35. Both teachers worked together to report on J.M.'s progress towards meeting his dyslexia goals. Id. at 3830. J.M. finished the DIP by the end of summer 2017. Id. at 3861.
The ARD met on March 27, 2017 to review J.M.'s dyslexia program and comply with a Texas Education Agency corrective action. J.5 at 6.[6] In response to the Texas Education Agency's directive, the ARD designed a new set of dyslexia IEP goals specifically addressing J.M.'s need to work on morphology and handwriting skills. Id. The ARD agreed on the revised set of dyslexia goals for the remainder of the 2016-17 school year through March 2018. Id. at 2, 6, 8.
The March 2017 ARD also planned for J.M.'s next annual ARD. Id. at 6. J.M.'s mother was provided with an OHI form so that J.M.'s doctor could confirm J.M.'s eligibility as a student with OHI. Id. The ARD also planned to conduct additional vocational and aptitude assessments and identify J.M.'s post-secondary areas of strength and need. Id. J.M.'s mother conveyed to the ARD J.M.'s expressed interest in programs at Texas State Technical College ("TSTC") and McClennan Community College. Id. J.M.'s mother also provided consent for the proposed assessments and to invite outside agencies, such as the Texas Workforce Commission ("TWC"), to future ARD meetings. Id.
In preparation for J.M.'s ARD in May 2017, three of J.M.'s teachers provided feedback to Ms. Bush regarding his performance in their classes. His teachers complimented his attitude in class and noted he completed his work even if he sometimes required reminders to stay on task. R.7 at 1-3. His Spanish and Science teachers stated there was little to no difference in his classroom performance after breaks. Id. at 1, 3. In English, J.M. worked very hard and even passed the 2017 STAAR English I EOC with a very decent score after failing the summer and fall 2016 STAAR English I EOC. Id. at 2. According to his English teacher, taking tests in a small group was an effective accommodation because he was not as embarrassed when the teacher read aloud questions and answer choices. Id.
J.M.'s annual ARD met on May 24, 2017. R.8 at 1. In addition to the annual review, the purpose of the ARD was to discuss J.M.'s transition needs, review additional assessment data, and conduct a Review of Existing Educational Data ("REED"). Id. at 53. The ARD again confirmed J.M.'s eligibility for special education as a student with OHI and SLD for basic reading skills *582 co-occurring with dyslexia, reading comprehension, math calculation, and math problem solving. Id. at 1-2. J.M.'s parents again received an OHI form so J.M.'s physician could confirm the diagnosis for the 2017-18 school year-J.M.'s physician did so on June 1, 2017. Id. at 2, 53; J.7 at 2.
The May 2017 ARD also reviewed J.M.'s grade report. J.M. was generally successful in the classroom as he passed each six weeks with at least average grades-these grades were consistent with the teacher reports to Ms. Bush as J.M.'s case manager. R.8 at 7; A.R. at 3900. J.M. completed the same assignments as his classmates, kept up with his classmates academically, and earned the grades he received. A.R. at 3901, 3968-69, 3976-78. J.M. did not receive a grade below an 80 for the 2016-17 school year. R.8 at 7-8. J.M. was supposed to take the English II STAAR EOC in the spring but was absent the day it was administered-he passed the exam on his first try in the summer of 2017. R.19 at 25.
The May 2017 ARD included a list of J.M.'s PLAAFPs for the following areas: physical, behavioral, discipline, functional, and academic. R.8 at 2. The PLAAFPs were verbal statements about J.M.'s current abilities in each of the listed areas. Id. The District used these PLAAFPs to propose new IEP goals and objectives for English, Math, and Dyslexia services. Id. at 38-47. The English reading goals addressed J.M.'s basic reading and comprehension skills-these goals referenced the TEKS standard for eleventh graders. Id. 39-41. Progress reports were to be issued every three weeks. Id. at 41. The Dyslexia goals addressed J.M.'s needs to further develop his decoding skills. Id. at 43-44. The District used the following data sources in developing J.M.'s PLAAFPs for the dyslexia services: DIP mastery checks, DIP daily work, classroom observations, and additional student work. Id. at 44. Progress reports were to be issued every six weeks. Id. The May 2017 ARD was suspended so that J.M.'s parents could meet with the high school's principal to discuss goals and objectives for math. Id. at 56.
The May 2017 ARD also discussed transition services. Id. at 53. The ARD invited a TWC representative, but the representative could not attend the meeting. Id. The ARD planned on inviting a TWC representative to all future meetings. Id. The ARD also reviewed the recently conducted functional vocational evaluations. J.M. reported a new interest in auctioneering as a post-secondary employment goal and continued expressing interest in attending TSTC. Id. at 12. J.M. worked on earning his driver's license and participated in baseball and agriculture as school/community activities. Id. J.M.'s mother confirmed J.M.'s newfound interest in auctioneering and expected he would attend a technical or trade school. Id. at 14. J.M.'s mother still did not express interest in J.M. taking vocational or career education classes. Id. The ARD also conducted a vocational assessment interview with J.M.'s science and chemistry teachers. Id. at 15-16. Both teachers conveyed J.M. was on time for class, completed his assigned tasks, and worked well with his classmates and teachers. Id. Both confirmed his interest in activities related to agriculture. Id.
Based on these vocational assessments, the ARD completed a transition plan for J.M. Id. at 11. J.M. was invited to attend to discuss his transition but did not attend; however, his parents were present at the meeting. Id. The plan noted J.M.'s interest in attending a trade or technical school and that he wanted to study auctioneering. Id. The ARD noted J.M. had already taken steps towards achieving those goals by taking the PSAT. Id. The plan notes that J.M. wished to become an auctioneer after graduating from trade or technical school *583 as well as J.M.'s employment experience in construction and working with cattle. Id. The plan also noted that J.M. had demonstrated independent living skills and therefore did not require any specific instruction in adult living skills. Id. J.M.'s measurable post-secondary goals were as follows: (1) Training: "[u]pon graduation from high school, [J.M.] will enroll in an institution of higher learning to pursue training in the field of auctioneering"; (2) Education: "[u]pon graduation from high school, [J.M.] will enroll in an institution of higher learning"; (3) Employment: "[u]pon completion of certification/degree, [J.M.] will seek to obtain employment in order to live independently and support himself financially." Id. The transition plan referred to J.M.'s schedule of services-including his courses of study-as the set of transition services he needed to reach his postsecondary goals. Id.
The ARD included a copy of J.M.'s four-year graduation plan, which included planned course selections through twelfth grade including dyslexia and agriculture classes. Id. at 18. The ARD also requested a copy of J.M.'s recently conducted Independent Educational Evaluation ("IEE"). Id. at 53. The results of the IEE were included in the revised REED. Id. J.M.'s mother expressed concerns during the meeting to the ARD about J.M.'s math abilities. Id. In response, the ARD agreed to design new math goals prior to the start of the upcoming school year. Id. The May 2017 ARD agreed to reconvene prior to the start of the 2017-18 school year to develop J.M.'s class schedule and classroom accommodations. Id. at 53. The May 2017 ARD documents included PWN to J.M.'s parents. Id. at 56. The PWN explained the decisions of the ARD, the basis for those decisions, the options considered and why they were rejected or not, the evaluation procedures, tests, records, and reports used as the basis for their decisions, and any other relevant factors that were considered when making their decisions. Id.
J.M.'s parents, J.M.'s principal (Principal Cope), and others conversed throughout the summer leading up to the 2017-18 school and came to agreements on additional math instruction, a summer schedule for compensatory dyslexia services, and Assistive Technology ("AT") training. R.10 at 1-28. J.M.'s mother and Principal Cope worked together collaboratively with little to no tension. J.M.'s mother appeared to have felt comfortable in making known her concerns and opinions, and Principal Cope always addressed her concerns and opinions in a professional manner. In short, both parties were committed to developing an appropriate educational plan for J.M.
The Co-Op Director met with J.M. twice in August 2017 before school started to show him how to use a device called a Livescribe pen. A.R. at 3331-32. A Livescribe pen can transform handwritten text into typed text and also has the ability record-it can be used with an iPad or iPhone. Id. at 3330. The Director told J.M. to take it home and practice with it over the weekend and to come back the next week with any questions. Id. at 3331. J.M. was comfortable with the Livescribe pen and was excited to use it because he would not stand out amongst his peers in the classroom. Id. at 3332. Despite these assurances, it is unclear whether J.M. used the Livescribe pen during the 2017-18 school year. Id. at 3333.
The ARD committee reconvened on August 9, 2017 to complete the May 2017 ARD. R.11 at 28. By this time, J.M. had passed the summer 2017 administrations of the STAAR Algebra I EOC, STAAR Biology EOC, and the STAAR English II EOC exams. R. 19 at 17-19, 25. J.M. had also completed DIP over the summer, so the parties selected a new dyslexia program for the 2017-18 school year. A.R. at *584 3762. In response to concerns expressed by J.M.'s mother, the District hired a certified reading teacher for his Dyslexia class so that he could earn a reading credit for that course. Id. at 3763. The District also agreed to continue providing dyslexia instruction in a one-on-one setting-even though it wished to provide such services in a small group setting-so that it could comply with J.M.'s mother's request. Id. at 3764-65. J.M.'s mother also wanted J.M. to receive math instruction in a one-on-one setting. Id. at 3765. However, the District disagreed because they thought this would not be the Least Restrictive Environment. Id. at 3765-66. As a compromise, the District agreed to provide J.M. with a math-intensive class during the "advisory" period. Id. at 3766.
The parties agreed to a 10-day recess because of disagreements between the parents and the District. R.11 at 2, 29. Following unsuccessful attempts to reconvene, J.M.'s mother notified the District on August 21, 2017 that she no longer wanted to reconvene because the newly initiated due process hearing was pending. Id. at 29. The District provided PWN with the set of the August 2017 ARD documents. Id. at 32-33. The PWN explained the decisions of the ARD, the basis for those decisions, the options considered and why they were rejected or not, the evaluation procedures, tests, records, and reports used as the basis for their decisions, and any other relevant factors that were considered when making their decisions. Id. The District also sent a proposed IEP amendment to correct a mistake on the schedule of services page, which inadvertently omitted the special education consult services. R.16 at 2. The District continued to provide such services despite the refusal of J.M.'s parents to agree to the proposed IEP amendment. Id. The District implemented the class schedule agreed to by the parties at the August 2017 ARD and implemented J.M.'s previous IEP in accordance with the "stay-put" provision in the Individuals with Disabilities Education Act ("IDEA"). 20 U.S.C. § 1415(j) ; R.11 at 2.
The Special Education Hearing Officer ("SEHO") concluded that the District did not commit any procedural violations of the IDEA and provided J.M. a Free Appropriate Public Education ("FAPE"). A.R. at 42-47. On March 2, 2018, Plaintiffs sued the District, appealing the decision of the SEHO. Document No. 1 at 1-2. Plaintiffs allege the SEHO erred by: (1) considering the substantive merits of J.M.'s IEPs before considering possible procedural violations; (2) concluding J.M. received a FAPE by relying upon his modified and accommodated grades, states tests, and modified grade requirement; (3) concluding J.M. received appropriate transition services; (4) ignoring Plaintiffs' three experts; (5) minimizing or ignoring repeated procedural violations by the District; (6) not allowing Plaintiffs' experts the opportunity to observe all of the District's purported experts; (7) ignoring the District's failure to provide J.M. with direct services in math; and (8) applying the incorrect standard of evidence. Id. at 4-6. The Parties filed cross-motions for summary judgment on October 30, 2018, each seeking a ruling on the administrative record. Document Nos. 49-50. The Parties have fully briefed this dispute.
II. Legal Standard
Because Texas receives federal education funding, all school districts within the state must comply with the IDEA. Cypress-Fairbanks Indep. Sch. Dist. v. Michael F. , 118 F.3d 245, 247 (5th Cir. 1997). Congress enacted the IDEA to ensure children with disabilities receive a "free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living."
*585 20 U.S.C. § 1400(d)(1)(A). To achieve this goal, the IDEA requires states to educate children with disabilities "to the maximum extent appropriate ... with children who are not disabled," and to do so "in the least restrictive environment consistent with [the child's] needs ...." Teague Indep. Sch. Dist. v. Todd L. , 999 F.2d 127, 128 (5th Cir. 1993). A school district need not provide the best possible FAPE, "nor one that will maximize the child's educational potential." Michael F. , 118 F.3d at 247. Instead, "[t]he FAPE must be tailored to each disabled child's needs through an 'individualized education program,' which is a written statement prepared [by a committee composed of] a 'qualified' and 'knowledgeable' school district representative, a teacher, the child's parents or guardians, and, when appropriate, the child himself." El Paso Indep. Sch. Dist. v. Richard R. , 567 F. Supp. 2d 918, 925 (W.D. Tex. 2008) (citing 20 U.S.C. § 1414(d)(1)(B) ). In Texas, the committee responsible for preparing a student's IEP is the ARD committee.
Under the IDEA, any party aggrieved by the SEHO's findings and decision may bring suit in district court. 20 U.S.C. § 1415(i)(2)(A). "Under the IDEA, a federal district court's review of a [SEHO's] decision is 'virtually de novo. ' " Adam F. ex rel. Robert J. v. Keller Indep. Sch. Dist. , 328 F.3d 804, 808 (5th Cir. 2003). "The hearing officer's findings should be accorded 'due weight,' but the district court must arrive at an independent conclusion based on a preponderance of the evidence." Id. As such, even though it is termed summary judgment, the existence of a disputed material fact will not defeat a summary judgment motion. Reyes v. Manor Indep. Sch. Dist. , No. A-14-CA-00469, 2016 WL 439148, at *4 (W.D. Tex. Feb. 2, 2016).
The IDEA creates a presumption in favor of a school district's IEP. White ex rel. White v. Ascension Parish Sch. Bd. , 343 F.3d 373, 377 (5th Cir. 2003). Accordingly, the party challenging the IEP bears the burden of showing the IEP was inappropriate under the IDEA. Richardson Indep. Sch. Dist. v. Michael Z. , 580 F.3d 286, 292 n.4 (5th Cir. 2009). A district court should not substitute its "own notions of sound educational policy for those of the school authorities which [it] review[s]." Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley , 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). To that end, a district court's task is to determine whether a school district complied with the IDEA and not to second guess their educational decision making. R.H. v. Plano Indep. Sch. Dist. , 607 F.3d 1003, 1010 (5th Cir. 2010).
III. Application: Denial of a FAPE
A district court's review of a SEHO's decision is twofold: the court must (1) determine whether the school district complied with the IDEA's procedural requirements, and (2) then determine if the student's IEP is reasonably calculated to provide meaningful educational benefits. Rowley , 458 U.S. at 177, 102 S.Ct. 3034. In this case, Plaintiffs assert the District denied J.M. a FAPE by violating both the procedural safeguards and substantive provisions of the IDEA.
A. 5Procedural Violations
A procedural violation standing alone does not entitle a plaintiff to relief-a plaintiff must also show substantive harm precipitating from the procedural violation. Adam J. , 328 F.3d at 811-12. Specifically, a plaintiff must show that the procedural violation (i) impeded the child's right to a FAPE; (ii) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE; or (iii) caused a *586 deprivation of educational benefits. 20 U.S.C. § 1415(f)(3)(E)(ii). Plaintiffs allege the District committed seven procedural violations. The Court will address each alleged procedural violation in turn.
i. The SEHO did not violate the two-prong Rowley test.
Plaintiff first alleges the SEHO failed to correctly apply the two-prong Rowley test and therefore failed to comply with 20 U.S.C. § 1415(f)(3)(A) and (E). Pls.' Mot. Summ. J. at 21. Although district courts must apply the two-prong Rowley test, Plaintiffs cite no authority that requires a SEHO to consider procedural violations before addressing substantive violations.[7] Additionally, nothing in § 1415(f)(3)(E) indicates that the SEHO must first address procedural issues before addressing substantive violations. See 20 U.S.C. § 1415(f)(3)(E) (requiring a hearing officer's decision to be made on "substantive grounds based on a determination of whether" a child received a FAPE and listing what must be found for a procedural violation to constitute a denial of a FAPE). Accordingly, the SEHO did not violate the IDEA by considering the substantive issues before considering any procedural violations.
ii. The SEHO did not ignore the IEP mandate.
Plaintiffs allege J.M.'s IEP was not properly implemented. Pls.' Mot. Summ. J. at 22. The SEHO found "some evidence [that J.M.'s] teachers were not fully informed as to which version of the IEP was in place for 2017-2018." A.R. at 45. According to Plaintiffs, the SEHO ignored the impact of this finding regarding the IEP mandate since the District's staff could not implement an IEP if they did know which IEP they were to implement in the first place. Pls.' Reply at 5.
A "party challenging the implementation of an IEP must show more than a de minimis failure to implement all elements of that IEP, and, instead, must demonstrate that the school board or other authorities failed to implement substantial or significant provisions of the IEP." Houston Indep. Sch. Dist. v. Bobby R. , 200 F.3d 341, 349 (5th Cir. 2000) (emphasis added). Plaintiffs focus on the confusion amongst J.M.'s teachers but fail to discuss how this specifically impacted the implementation of J.M.'s IEP during the 2017-18 school year. In fact, Plaintiffs fail to cite any evidence demonstrating that J.M.'s teachers failed to implement substantial or significant provisions of his IEP during the 2017-18 school year. Additionally, Plaintiffs cite to testimony that does not even address J.M.'s IEP for the 2017-18 school year to support their claim-the testimony addresses J.M.'s IEP during the 2016-17 school year instead. Pls.' Reply at 6 ("June or August 2016 IEP in place (Director Holland); June 2016 IEP in place (Principal Cope); June/August 2016 and March 2017 IEP (Diagnostician Pomykal).") (citations omitted). Plaintiffs are probably correct that it would be quite difficult to implement an IEP without teachers knowing which IEP to implement in the first place. However, Plaintiffs have not taken the next step and shown how such confusion, if any, amongst the District's teachers caused them to not implement substantial or significant provisions of J.M.'s IEP during the 2017-18 school year. Accordingly, the SEHO did not ignore the IDEA's IEP mandate.
*587 iii. The SEHO did not ignore the lack of a transition assessment.
Plaintiffs argue the SEHO erred in finding the District conducted a transition assessment. Pls.' Mot. Summ. J. at 22.[8] According to Plaintiffs, the interviews conducted by the District do not constitute a transition assessment. Id. Even if these interviews were an assessment, the District infringed on J.M.'s parents' meaningful participation because they were misinformed regarding transition services. Id.[9]
Transition services are "a coordinated set of activities ... designed to be within a results-oriented process." 34 C.F.R. § 300.43(a)(1). These services should be "focused on improving the academic and functional achievement of the child ... to facilitate the child's movement from school to post-school activities." Id. These activities include postsecondary education, vocational education, integrated employment, independent living, or community participation. Id. Transition services should be based on the child's individual needs and consider the child's strengths, preferences, and interests. Id. at § 300.43(a)(2). They should also help develop the child's living skills so that he or she can achieve their employment and other post-school living objectives. Id. at § 300.43(a)(2)(iv). To create appropriate transition services for the child, appropriate measurable postsecondary goals must be created that should be based on "age appropriate transition assessments related to training, education, employment, and where, appropriate, independent living skills." 20 U.S.C. § 1414(d)(1)(A)(VIII)(aa). The transition services that are created as a result of the transition assessment should "assist the child in reaching those [appropriate measurable postsecondary] goals." Id. at § 1414(d)(1)(A)(VIII)(bb).
In sum, the purpose of a transition assessment appears to be to collect information on a child's needs, strengths, preferences, and interests as they relate to measurable postsecondary goals. This process requires a school district to identify what secondary and postsecondary environments the child wishes to be a part of and what accommodations, services, support, and technology will help the child achieve his or her goals. The IDEA does not elaborate on what constitutes a sufficient "transition assessment." Accordingly, it appears school districts are free to choose the means for conducting a transition assessment so long as it achieves the overall purpose of such an assessment.[10] The overall purpose of a transition assessment is to identify the child's basic needs and post-school goals, which should help drive the transition requirements in the IEP process.
With the purpose of the transition assessment and transition services in mind, the Court finds the District performed a transition assessment. The District did conduct an assessment to identify J.M.'s strengths, preferences and interests so that appropriate transition services could be created. At the District's request, (1) J.M. completed a Vocational Assessment Student Interview form; (2) his mother completed a Vocational Assessment-Parent *588 Interview form; and (3) his teacher completed a Vocational Assessment-Teacher Interview form. J.1 at 8-10. The District continued to conduct such interviews and continually assessed whether J.M.'s interests, goals, and academic needs had changed. R.8 at 11-16; R.9 at 12; R.12 at 13. The District used these interviews and their assessment of these interviews to determine J.M. was interested in pursuing a career in welding or auctioneering and that he was interested in attending TSTC. J.1 at 9-10; R.8 at 12-13. Based off this evidence, the Court finds the District did conduct a transition evaluation and determined J.M.'s strengths, preferences, and interests so that the District could create adequate transition services. Because of the reasons above, the Court finds the District did conduct a transition assessment; therefore, the SEHO did not ignore the lack of a transition assessment.
iv. J.M.'s parents were not denied a meaningful opportunity to participate in collaborating on J.M.'s IEP.
Plaintiffs argue that the SEHO ignored the mandates of 20 U.S.C. §§ 1415 and 1414(d), which require the student's parents to be integral partners in the collaborative process of IEP development. Pls.' Mot. Summ. J. at 23. In support of this contention, Plaintiffs assert that (1) neither they nor the District's staff knew who chose 15 minutes every six weeks or 2.5 minutes of indirect special education help for J.M.; (2) Falls Education Cooperative wrote J.M.'s IEPs on a computer instead of projecting them on a screen; (3) they did not receive prior written notice regarding ESY, AT, the basis for the 2.5 minutes of J.M.'s indirect services, or that J.M. was not getting any direct help with transition services; and (4) J.M.'s mother was unable to intelligently participate because she did not understand the vocational forms she was filling out. Id. at 22-24.
The IDEA "imposes extensive procedural requirements designed to 'guarantee parents both an opportunity for meaningful input into all decisions affecting their child's education and the right to seek review of any decision they think inappropriate." Buser by Buser v. Corpus Christi Indep. Sch. , 51 F.3d 490, 493 (5th Cir. 1995) (citing Honig v. Doe , 484 U.S. 305, 311-312, 108 S.Ct. 592, 98 L.Ed.2d 686 (1987) ). Such procedural safeguards include the following: "(1) an opportunity for the parents to examine all the child's records and to obtain an independent educational evaluation of the child; (2) written prior notice to the parents whenever the local education agency or intermediate educational unit proposes or refuses to initiate or change the 'identification, evaluation, or educational placement of the child or the provision of a free appropriate public education to such child'; and (3) an opportunity for parents to present complaints to the agency or educational unit, including the opportunity for [a] due process hearing before the state or local education agency." Id. (citing 20 U.S.C. § 1415(b)(1)(A), (C), (E), and (2) ).
The Court finds Plaintiffs' arguments unconvincing for the following reasons. First, Plaintiffs fail to cite any authority suggesting the IDEA required the District to affirmatively disclose such minute details as the identity of the person who chose 15 minutes every six weeks or 2.5 minutes of indirect special education help for J.M. in order for J.M.'s parents to be meaningful participants in the development of his IEP. In fact, the Fifth Circuit has expressly recognized the fact that "not every conversation about a child is a statutorily-defined meeting in which the parents must participate." R.P. ex. rel. R.P. v. Alamo Heights Indep. Sch. Dist. , 703 F.3d 801, 810-12 (5th Cir. 2012) (finding parents were not denied meaningful participation despite fact that some decisions about the *589 student's IEPs were made prior to the ARD meetings where the parents were present and had the opportunity to voice their thoughts at ARD meetings and the school district incorporated changes proposed by the parents into the student's IEPs). Second, Plaintiffs similarly provide no authority suggesting that J.M.'s IEPs had to be projected on a screen in order for J.M.'s parents to be meaningful participants.
Third, § 1415(b)(3) requires that prior written notice be given to a student's parents "whenever the local education agency-(A) proposes to initiate or change; or (B) refuses to initiate or change, the identification, evaluation, or educational placement of the child, or the provision of a free public education to the child." 20 U.S.C. § 1415(b)(3). Contrary to Plaintiffs' argument, the Administrative Record shows that prior written notice was issued for the June 2016, August 2016, March 2017, May 2017, August 2017, and November 2017 ARD committee meetings. J.1 at 25-26; J.4 at 24; J.5 at 8; R.8 at 56-57; R.11 at 32-33; R.17 at 16. Additionally, J.M.'s parents attended the majority of J.M.'s ARD committee meetings and were given the opportunity to voice any concerns. See, e.g. , J.1 at 8; J.5 at 6; R.8 at 53. Accordingly, the District complied with the IDEA's prior written notice requirement regarding transition services.
Fourth, the deposition testimony of J.M.'s mother contains no indication that she did not understand the vocational assessment form she filled out at the June 2016 ARD or that she was confused about the answers she provided. AR at 3606-07, 3619-3620. She does suggest that she might have answered the questions differently had she been given more time to think about her answers; however, she gave almost identical answers to the same questions almost one year later at the May 2017 ARD. J.1 at 11; R.8 at 14. It was important that she intelligently answer the vocational assessment questions because those answers would be used to help create J.M.'s transition plan. Because it appears that J.M.'s mother understood how to intelligently answer the questions asked on those forms, the Court finds that the confusion, if any, of J.M.'s mother in filling out the aforementioned forms does not show she was prevented from meaningfully participating in the development of J.M.'s IEP.
Finally, the sole case cited by Plaintiffs in support of these contentions, Caldwell I.S.D. v. L.P. , is so clearly distinguishable from the present litigation as to be inapplicable to its resolution. 994 F. Supp. 2d 811 (W.D. Tex. 2012). Contrary to Caldwell , the Administrative Record in the present case is not "replete with instances" of a "deplorable breakdown" between the District and J.M.'s parents. Id. at 819. Unlike the school district in Caldwell , there is no evidence that the District attempted to block J.M.'s parents from collaborating in the development or implementation of J.M.'s IEP. See ids="4065834" index="46" url="https://cite.case.law/f-supp-2d/994/811/">id. (the student's social studies teacher did not notify the student's parent that the student was failing the social studies class because the teacher had been instructed by the school district to not to talk to the parent due to the pending dispute).
As outlined in Section I of this Order, the District went to great lengths to communicate with J.M.'s parents and involve them in the IEP development process. For example, the District (1) would transmit proposed IEPs to J.M.'s parents when requested; (2) would make J.M.'s parents aware of ARD meetings and what issues would be discussed at such meetings; (3) agreed to a modified passing grade standard for J.M. so that he could participate in UIL activities in response to J.M.'s mother's request; and (4) showed a willingness *590 to compromise and work with J.M.'s parents when disagreements arose. R.6 at 1; J.4 at 25-27; J.1 at 21; J.4 at 22, 24; A.R. at 3764-766. In short, the relationship between the District and J.M.'s parents was far from being distrustful or confrontational-instead, it was collaborative with both sides working towards doing what was best for J.M. For these reasons, the Court finds that the District complied with the IDEA's procedural mandates regarding parental involvement.
v. The District timely conducted a transition assessment.
Plaintiffs argue that the District failed to conduct a timely transition assessment. Pls.' Mot. Summ. J. at 4. Under Texas law, "appropriate transition planning ... must begin for a student not later than when the student reaches 14 years of age." TEX. EDUC. CODE ANN. § 29.0111 (emphasis added). Federal law requires that "age appropriate transition assessments related to training, education, and employment" be conducted prior to "the first IEP to be in effect when the child is 16." 20 U.S.C. § 1414(d)(1)(A)(i)(VIII).
On June 2, 2016, J.M.'s ARD committee convened, in part, to conduct transition planning for J.M. J.1 at 8. Prior to this meeting, the District administered an interview with J.M. to identify his career preferences and interests, and the District also administered interviews with J.M.'s mother and one of his teachers. Id. at 8-10. The District conducted similar interviews before and during the May 2017 ARD. R.8 at 11. At the May 2017 ARD, the ARD committee further assessed J.M.'s independent living goals and objectives and developed measurable postsecondary goals based on the aforementioned interviews. R.8 at 11. Plaintiffs fail to cite any law or articulate any reason as to why conducting such transition interviews would not constitute part of the transition planning process.[11] Accordingly, the Court finds that the District complied with the IDEA's timeliness requirement because the District conducted a transition assessment prior to J.M.'s first IEP at age 16. See supra Section III(A)(iii), at 19-21. For these reasons, the Court finds that the District timely conducted a transition assessment under federal law.
vi. The SEHO did not ignore the lack of measurable transition goals.
Plaintiffs argue that the SEHO ignored the District's failure to provide a single measurable transition goal for the entire 2016-2017 school year. Pls.' Mot. Summ. J. at 15, 23. The primary contention of Plaintiffs' argument can be summed up as follows: the transition goals provided by the District were not measurable because they lacked specificity and objectivity. Id. Alternatively, the transition goals were not measurable because they failed to provide a present level of performance or baseline so that progress could be measured. Id. at 23.
The IDEA requires an IEP to include transition services that are "designed to facilitate the child's movement from school to post-school activities, including post-secondary education, vocational education, integrated employment ... independent living, or community participation." 34 C.F.R. § 300.43(a). Pursuant to 20 U.S.C. § 1414, these transition services must include "appropriate measurable postsecondary goals based upon age appropriate transition assessments related *591 to training, education, employment, and, where appropriate, independent living skills; and ... the transition services (including courses of study) needed to assist the child in reaching those goals." 20 U.S.C. § 1414(d)(1)(A)(i)(VIII). Section 1414 does not set forth specific criteria for the measurability of postsecondary goals. Nevertheless, the statutory mandate is guided by an overarching purpose of the IDEA- "[t]o ensure that all children with disabilities have available to them a free appropriate public education that ... prepare[s] them for further education, employment, and independent living." Renee J. as Next Friend of C.J. v. Houston Indep. Sch. Dist. , 913 F.3d 523, 532 (5th Cir. 2019) (citing 34 C.F.R § 300.1(a) ).
Plaintiffs focus on distinguishing case law cited by the SEHO rather than on providing precedent to support their arguments. The only case Plaintiffs cite regarding the degree of specificity required by the IDEA for transition goals is Gibson v. Forest Hills Local Sch. Dist. Bd. of Educ. 655 F. App'x 423 (6th Cir. 2016). Gibson , however, is critically distinguishable from the present dispute in that the postsecondary goals in Gibson did not include any postsecondary educational or training goals at all for the relevant school years. Id. at 438. Instead, the sole "employment-related goal" simply stated "Supportive Work Environment-Non-Competitive Work." Id. at 439. Regarding services and assignments designed to help the student accomplish that goal, the student's IEP only stated, "[p]articipate in in-school work-based learning experiences with supervision and support." Id. Based on its finding that the IEP goals appeared "to have foreclosed the possibility that the student would undertake any postsecondary employment, and said little about [the student's] postsecondary education or training," the Sixth Circuit held that the student's postsecondary goals were procedurally deficient. Id.
By contrast, J.M.'s IEP goals neither foreclose on the possibility of nor say so little about J.M.'s postsecondary education or training. Instead, J.M.'s transition goals are specific to and align with J.M.'s stated career interests. For example, in a vocational assessment, J.M. stated his desire to "make [his] mark and be an auctioneer." Leroy Van Dyke, The Auctioneer, on Golden Hits-The World's Most Famous Auctioneer (Sun International 1974); R.8 at 12. To engage this future employment interest, J.M.'s IEP included the transition goal of enrolling "in an institution of higher learning to pursue training in the field of auctioneering." J.1 at 8. Accordingly, Gibson does not support a finding that J.M.'s postsecondary goals were not measurable.
Further, Plaintiffs fail to provide any authority supporting their argument that J.M.'s transition goals were not measurable because they failed to provide a present level of performance or baseline so that progress could be measured. The cases Plaintiffs cite to supporting this argument support only the proposition that goals are, at best, rarely measurable in the absence of "baselines or methods to objectively measure progress." Anchorage Sch. Dist. v. D.S. , 688 F. Supp. 2d 883, 889 (D. Alaska 2009). However, Plaintiffs fail to explain and provide no support for why J.M.'s progress reports could not serve as a baseline to objectively evaluate J.M.'s progress with respect to his transition goals.
The Court instead finds that J.M. was provided with sufficiently measurable transition goals. J.M.'s parents and the District collaborated on the development of J.M.'s IEP, including the creation of J.M.'s transition goals. J.1 at 8; J.5 at 6; R.8 at 53. J.M.'s transition goals attempted to engage his future principal employment interests in welding and auctioneering. J.1 at 9; R.8 at 11. J.M. was also enrolled in *592 classes geared toward graduation from high school, which was required for J.M. to achieve his transition goals of enrolling in postsecondary institutions. R.5 at 4; R.11 at 23. He was also placed in two Agriculture classes to foster his interest in auctioneering and welding and help him achieve his goals. R.11 at 23. The District further provided J.M.'s parents with a variety of information and opportunities to explore enrollment in institutions relevant to J.M.'s desired postsecondary education. J.1 at 21. Additionally, the District planned a full day field trip to see MCC and TSTC to visit the disability officers and learn about their postsecondary programs. A.R. at 3777-78, 3912-13. This trip included a visit to certificate programs at TSTC, including their program on welding.[12] Id. at 3912.
Further, J.M.'s aforementioned transition goals clearly targeted the requisite areas of "training, education, and employment." 300.320(b). As discussed above in Sections I and III(A)(vi) of this Order, J.M.'s IEP contained transition goals geared toward enrollment in higher education, his vocational interests in auctioneering and welding, and seeking future employment. J.1 at 8-10; R.8 at 12. For example, J.M.'s IEP included the following transition goals: (1) Training: "[u]pon graduation from high school, [J.M.] will enroll in an institution of higher learning to pursue training in the field of welding"; (2) Education: "[u]pon graduation from high school, [J.M.] will enroll in an institution of higher learning to pursue a welding certification"; (3) Employment: "[u]pon completion of certification/degree, [J.M.] will seek to obtain employment in order to live independently and support himself financially." J.1 at 8. Although J.M.'s IEP did not contain any transition goals regarding independent living skills, such goals were determined as unnecessary by the ARD committee because J.M. was already demonstrating independent living skills at home. Id. at 8; R.8 at 11; 34 C.F.R. § 300.320(b)(1) (transition goals related to independent living skills required only "where appropriate").
Because of the above, the Court finds that the District provided J.M. measurable transition goals and sufficient transition services to help him achieve those goals. See Coleman v. Pottstown Sch. Dist. , 983 F. Supp. 2d 543, 574 (E.D. Pa. 2013) (no denial of a FAPE based on insufficient transition planning where the student's "vocational interests were considered and vocational services were provided, including enrollment in mechanics, computer training, and culinary classes," and the student's "IEP team explored his interest in a possible career path with the U.S. military"). J.M.'s transition plan furthered the overarching purpose of such plans: preparing students with disabilities for further education, employment, and independent living. Renee J. , 913 F.3d at 532. In reaching its decision, the Court is "mindful of its obligation to not stray into the field of education policymaking," Renee J. , 913 F.3d at 533, and of the fact that "the IDEA requires deference to the expertise of administrative officers" regarding "the sufficiency of [the] goals and strategies in an IEP," Grim v. Rhinebeck Cent. Sch. Dist. , 346 F.3d 377, 382 (2d Cir. 2003).
vii. The District did not violate the IDEA by failing to provide a licensed dyslexia teacher.
Plaintiffs claim the SEHO erred in finding the District did not violate the IDEA by failing to provide a high school *593 licensed dyslexia specialist or teacher. Pls.' Mot. Summ. J. at 23. In Texas, a teacher must hold an appropriate certificate or permit to be employed by a school district. TEX. EDUC. CODE § 21.003(a). Texas does not have a certification requirement specific to teachers providing intervention to students with dyslexia. 19 TEX. ADMIN. CODE § 74.28(e). Such teachers are only required to "be trained in instructional strategies that used individualized, intensive, multisensory, phonetic methods and a variety of writing and spelling components described in the 'Dyslexia Handbook: Procedures Concerning Dyslexia and Related Disorders.' " Id. J.M.'s dyslexia teachers met these qualifications. A.R. at 3802, 3813-815. Because they met the qualifications needed to provide intervention to students with dyslexia, the SEHO did not err in finding that the District did not violate the IDEA by failing to provide a high school licensed dyslexia specialist or teacher.
viii. The SEHO correctly conducted the hearing.
Plaintiffs allege the SEHO did not correctly conduct the hearing because the SEHO: (1) repeatedly permitted subjective hearsay evidence to be admitted; (2) did not give Plaintiffs' expert witnesses the opportunity to observe all of Defendants' purported witnesses; (3) failed to rule on a request that one of Plaintiffs' witnesses be deemed an expert; and (4) refused to permit an offer of proof. Pls.' Mot. Summ. J. at 24. The Court addresses each allegation in turn.
First, the Court cannot make a ruling on whether the SEHO permitted subjective hearsay evidence because Plaintiffs fail to point out which statements are impermissible hearsay in the first place. U.S. v. Dunkel , 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in [the record]."). It is not the Court's job to find contested evidence and then make an argument for why it should be excluded-that job is for Plaintiffs, and they have failed to do so here.
Second, the Court cannot make a ruling on whether the SEHO erred in (1) failing to allow Plaintiffs' expert witnesses the opportunity to observe all of Defendants' purported witnesses; or (2) failing to rule on a request that one of Plaintiffs' witnesses be deemed an expert. The Court cannot make a ruling on either objection because Plaintiffs fail to explain why either alleged failure was improper. Plaintiffs merely make conclusory allegations without relying on any authority that would compel a ruling in their favor.
Finally, the SEHO did not refuse to permit an offer of proof as Plaintiffs allege-the SEHO explicitly told Plaintiffs to make their offer of proof at a later time. A.R. at 3486-487. Despite the SEHO's invitation, Plaintiffs never attempted to make their offer of proof again. Accordingly, Plaintiffs failed to adequately preserve error. Sw. Country Enters., Inc. v. Lucky Lady Oil Co. , 991 S.W.2d 490, 494 (Tex. App.-Fort Worth 1999, no pet.). Because of the reasons above, the Court finds the SEHO correctly conducted the hearing.
ix. The SEHO's decision is not contrary to standard legal practice.
Plaintiffs argue the SEHO's decision is contrary to standard legal practice because the SEHO: (1) ignored two of Plaintiffs' expert witnesses; (2) misapplied the evidentiary standard; (3) erred on the AT issue; and (4) failed to rule on extended school year services. The Court addresses each argument in turn.
First, it is incorrect to allege the SEHO ignored two of Plaintiffs' expert witnesses merely because the SEHO did not reference *594 them in her decision. Defendants are correct in asserting that the lack of reference to these two expert witnesses means, at most, that the SEHO did not find their testimony credible or that it did not warrant discussion. In short, the Administrative Record shows the SEHO made a credibility determination, which she was free to do. McAllister v. Dist. of Columbia , 45 F.Supp.3d 72, 76-77 (D.D.C. 2014) (finding that a SEHO's credibility determinations are entitled to deference absent "non-testimonial, extrinsic evidence in the record that would justify a contrary conclusion.").
Second, Plaintiffs support their allegation that the SEHO misapplied the evidentiary standard by cherry-picking statements made by the SEHO. As stated before, a procedural violation does not give rise to an actionable violation of the IDEA unless a plaintiff can show that the procedural violation (i) impeded the child's right to a FAPE; (ii) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE; or (iii) caused a deprivation of educational benefits. 20 U.S.C. § 1415(f)(3)(E)(ii). Here, the SEHO did make some statements that could be interpreted as finding a procedural violation; however, each of these statements was followed by an explanation for why Plaintiffs failed to prove one of the requirements for a procedural violation under § 1415(f)(3)(E)(ii). For example, even though the SEHO stated it appeared no AT evaluation was completed, she found that J.M.'s "IEPs nevertheless addressed [his] academic needs with appropriate instructional accommodations as support." A.R. at 43. Additionally, even though the SEHO found some evidence that teachers were not informed which IEP was in place, she found that the evidence as a whole suggested the services were provided in a coordinated, collaborative manner by the key stakeholders. Id. at 43-45. In sum, even assuming the SEHO's statements indicated there was a procedural violation, the SEHO found that Plaintiffs failed to prove one of the requirements for a procedural violation under § 1415(f)(3)(E)(ii). Because of this, the SEHO did not misapply the required evidentiary standard.
Third, the SEHO did not err on the AT issue. Plaintiffs appear to believe the SEHO erred on the AT issue because no technology evaluation was completed. Pls.' Mot. Summ. J. at 26. Under the IDEA, an IEP team must "[c]onsider whether the child needs assistive technology devices and services." 20 U.S.C. § 1414(d)(3)(B)(v) ; 34 C.F.R. § 300.324(a)(2)(v). "Assistive technology service" means "any service that directly assists a child with a disability in the selection, acquisition, or use of an assistive technology device." 20 U.S.C. § 1401(2). This includes "the evaluation of the needs of such child, including a functional evaluation of the child in the child's customary environment." 20 U.S.C. § 1401(2)(A). If AT services are needed, they should be included to provide a FAPE to a student with a disability. 20 U.S.C. § 1400(d)(1)(A) ; 34 C.F.R. § 300.105(a).
Defendants are correct in asserting that the IDEA does not explicitly require an evaluation for AT. The relevant regulations only require an IEP team to "[c]onsider whether the child needs assistive technology devices and services." 20 U.S.C. § 1414(d)(3)(B)(v) (emphasis added); 34 C.F.R. § 300.324(a)(2)(v). This may include an evaluation of the needs of a child, but a school district may also do what the District did here. Here, the District discussed J.M.'s AT needs at his ARD committee meeting on May 27, 2017 and determined that no action was necessary because he already had access to an iPad for note taking and written assignments. R.8 at 56. Additionally, the ARD committee made available an individual to review *595 the iPad's applications and software programs. Id. The individual was to follow-up with J.M. every three weeks. Id. Based off this evidence, the District did consider whether J.M. needed AT and decided providing him an iPad and extra instruction with that iPad was the best solution for J.M.'s circumstances. These actions comply with the IDEA and its accompanying regulations. See 20 U.S.C. § 1401(2)(B), (E) ("[A]ssistive technology service" includes "purchasing, leasing, or otherwise providing for the acquisition of assistive technology devices ... [and] training or technical assistance for such child."); 34 C.F.R. § 300.105(a) ; 34 C.F.R. § 300.324(a)(2)(v).[13]
Finally, Plaintiffs argue that the SEHO failed to rule on ESY services. The IDEA's regulations state that "each public agency must ensure that extended school year services are available as necessary to provide FAPE." 34 C.F.R. § 300.106(a)(1). If a school district finds that "the benefits accrued to the child during the regular school year will be significantly jeopardized if he is not provided an educational program during the summer months," then the child may be entitled to ESY. Alamo Heights Indep. Sch. Dist. v. State Bd. of Educ. , 790 F.2d 1153, 1158 (5th Cir. 1986). Here, the District did just that. The ADR committee explicitly considered ESY services on at least three occasions. R.4 at 14 ("[J.M.] does not exhibit a need for Extended School Year services through special education."); R.8 at 53 ("If state assessment standards are not met, [J.M.] may be required to attend summer school through general education."); R.11 at 29. Based on these discussions, the ADR committee concluded that ESY services were unnecessary because they did not believe J.M. would experience severe or substantial regression during the summer months. R.11 at 29 ("Information and feedback from [J.M.'s] teachers indicates that he does not show regression over breaks, he is able to maintain passing grades, and has positive progress reports, therefore ESY is not warranted."). Accordingly, the District did consider whether J.M. needed ESY services.
Regardless, the ESY services issue was subsumed within Plaintiffs' general contention that the District failed to provide J.M. with an appropriate IEP. A.R. at 196, 380. As a result, by finding that the District did provide J.M. with an appropriate IEP, the SEHO implicitly ruled that the ESY services issue had a negligible impact on Plaintiffs' broader contention. Because of the reasons above, the Court finds (1) the District did consider ESY services; and (2) that the SEHO did not fail to rule on ESY services.[14]
B. Substantive Violations
For a school district "to meet its substantive obligation under the IDEA [to a child], [the] school district must offer [the child] an IEP [that is] reasonably *596 calculated to enable [the] child to make progress appropriate in light of the child's circumstances." Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1 , --- U.S. ----, 137 S.Ct. 988, 999, 197 L.Ed.2d 335 (2017). Toward this end, the child's IEP "must be appropriately ambitious in light of his circumstances." Id. at 1000.
The Fifth Circuit has identified four factors to analyze when determining whether a school district has substantively complied with the IDEA: "(1) whether the program is individualized on the basis of the student's assessment and performance; (2) whether the program is administered in the least restrictive environment; (3) whether the services are provided in a coordinated and collaborative manner by the key 'stakeholders'; and (4) whether positive academic and non-academic benefits are demonstrated." Cypress-Fairbanks Indep. Sch. Dist. v. Michael F. by Barry F. , 118 F.3d 245, 253 (5th Cir. 1997). The Fifth Circuit has not specified a certain weight to apply to each factor; instead, these factors serve as " 'indicators' of an IEP's appropriateness ... intended to guide a district court in the fact-intensive inquiry of evaluating whether an IEP provided an educational benefit." Richardson Indep. Sch. Dist. v. Michael Z , 580 F.3d 286, 294 (5th Cir. 2009) (citing Houston Indep. Sch. Dist. v. VP ex rel. Juan P. , 566 F.3d 459, 467 (5th Cir. 2009) ; Adam J. v. Keller Indep. Sch. Dist. , 328 F.3d 804, 810 (5th Cir. 2003) ; Houston Indep. Sch. Dist. v. Bobby R. , 200 F.3d 341, 347 (5th Cir. 2000).
The Fifth Circuit has held that the Michael F. factors are consistent with the analytical framework established by the United States Supreme Court in Rowley and Endrew F. E.R. by E.R. v. Spring Branch Indep. Sch. Dist. , 909 F.3d 754, 765 (5th Cir. 2018). In Rowley , the Supreme Court identified the central inquiry regarding substantive compliance with the IDEA to be whether the student's IEP is "reasonably calculated to enable the child to receive educational benefits." Rowley , 458 U.S. at 206-07, 102 S.Ct. 3034. In Endrew F. , the Supreme Court then expanded on the standard for IDEA substantive compliance with respect to a child that was educated outside of the normal classroom setting. Endrew F. , 137 S.Ct. 988. Specifically, the Court in Endrew F. explained that a "child's educational program must be appropriately ambitious in light of his circumstances," which does not necessarily mean "aim[ing] for grade-level advancement if that is not a reasonable prospect." Id. at 992. Nevertheless, "for a child fully integrated in the regular classroom, an IEP typically should, as Rowley put it, be 'reasonably calculated to enable the child to achieve passing marks and advance from grade to grade.' " Id. at 992, 999 (reiterating, "advancement from grade to grade is appropriately ambitious for most children in the regular classroom").
In the period between the Rowley and Endrew F. opinions, the Fifth Circuit set forth the Michael F. factors as a means to measure an IEP's substantive compliance with the IDEA in light of the Rowley standard. Michael F. , 118 F.3d at 253. Although Michael F. preceded Endrew F. , the Michael F. factors are "fully consistent" with the Endrew F. appropriately ambitious standard. Spring Branch , 909 F.3d at 765. Rather than displacing Michael F. , Endrew F. simply provided "more clarity for what constitutes an appropriate IEP," especially with respect to children educated outside of the normal classroom setting. Id.
Plaintiffs allege that the District failed to comply with the substantive requirements of the IDEA because J.M. was denied a FAPE since J.M.'s IEP for the 2016-17 school year lacked transition services and transition goals. Pls.' Resp. at 6.
*597 In support of this allegation, Plaintiffs ground their substantive arguments solely on Endrew F. and virtually ignore the appropriateness of J.M.'s IEP under the Rowley standard and the Michael F. factors. In doing so, Plaintiffs misapply the aforementioned precedent and inappropriately lessen both the Rowley standard and the factors set forth by Michael F.[15] Nevertheless, because the Michael F. factors are consistent with the standards set forth in Rowley and Endrew F. , the Court will analyze Plaintiffs' substantive claims under the Michael F. framework.
i. J.M.'s IEP was individualized on the basis of his assessment and performance.
The first Michael F. factor weighs in favor of the District if J.M.'s IEP was "individualized on the basis of [J.M.'s] assessment and performance." Michael F. , 118 F.3d at 253. An IEP is sufficiently individualized when multiple assessments are conducted of the student, the ARD committee considers these assessments and parent and teacher input in developing the student's IEP, accommodations and modifications are made based on the student's test performance and parent input, and the IEP goals are revised or added to based on the new assessment data. Z.C. v. Killeen Indep. Sch. Dist. , No. W:14-CV-086, 2015 WL 11123347, at *6 (W.D. Tex. Feb. 17, 2015).[16]
Plaintiffs fail to argue that J.M.'s IEP was not sufficiently individualized. Moreover, the record shows that J.M.'s IEP was sufficiently individualized. Numerous assessments were conducted on J.M., including a Full Individual Evaluation ("FIE"), STAAR EOC exams, functional assessments, and vocational assessments. J.1 at 2-3, 8, 21; R.7 at 2; R.19 at 17-19, 25. J.M.'s ARD Committee considered the results of these assessments, J.M.'s PLAAFPs, J.M.'s grades, and parent and teacher input in developing J.M.'s IEPs. J.1 at 2; R.8 at 7, 38-47; A.R. at 3900; A.R. at 3763-65 (e.g., the District hired a certified reading teacher for J.M.'s dyslexia class and continued to provide one-on-one dyslexia instruction to J.M. in response to concerns expressed by J.M.'s mother). Based on this information, J.M.'s IEP goals and objectives were developed to address his areas of need in English, reading, math, functional study, and organizational skills. J.1 at 2, 8, 21. These goals were revised or added to based on new assessment data. Id. at 21. J.M.'s IEP further addressed his dyslexia and Crohn's disease. Id. at 2-5, 21; R.8 at 43-44; R.32 at 2; A.R. at 3762. Accordingly, the Court finds that J.M.'s IEP was sufficiently individualized and that the first Michael F. factor weighs in favor of the District. See Killeen Indep. Sch. Dist. , 2015 WL 11123347, at *6.
ii. J.M.'s IEP was administered in the least restrictive environment.
The second Michael F. factor weighs in favor of the District if J.M.'s IEP was "administered in the least restrictive environment."
*598 Michael F. , 118 F.3d at 253. A student's IEP is administered in the least restrictive environment when the student is enrolled in mainstream classes to the maximum appropriate extent. Klein v. Indep. Sch. Dist. v. Hovem , 690 F.3d 390, 399 (5th Cir. 2012) ("There is no real dispute that, because [the student] was enrolled in mainstream classes, [the student] was furnished specialized educational services in the least restrictive environment.") (citing 20 U.S.C. § 1412(a)(5)(A) ); 34 C.F.R. § 300.114(a)(2)(i) ("to the maximum extent appropriate, children with disabilities ... are educated with children who are nondisabled"). A student should be "removed from the regular educational environment ... only when the nature or severity of the disability ... is such that regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 34 C.F.R. § 300.114(a)(2)(ii).
The record shows that J.M.'s IEP was administered in the least restrictive environment. J.M. was educated in a regular classroom for all classes requisite to his graduation from high school. A.R. at 3901, 3968-69, 3976-78; see, e.g. , R.8 at 9, 48. In the regular classroom environment, J.M. was given accommodations to meet his unique needs. J.4 at 9, 12-13 (ARD Committee implemented medical accommodations based on J.M.'s Crohn's disease ); R.7 at 2 (J.M. took tests for his English class in a small group, which effectively reduced the embarrassment J.M. sometimes felt when the teacher read answer choices aloud); A.R. at 3331-32 (the District set J.M. up to use a Livescribe pen in class if he needed it). Furthermore, J.M.'s ARD Committee, including J.M.'s parent-member, agreed that J.M. was being educated in the least restrictive environment. J.1 at 21. Accordingly, and absent argument to the contrary, the second factor weighs in favor of the District.
iii. J.M.'s IEP services were provided in a coordinated and collaborative manner by the key stakeholders.
The third Michael F. factor weighs in favor of the District if J.M.'s IEP "services [were] provided in a coordinated and collaborative manner by the key 'stakeholders.' " Michael F. , 118 F.3d at 253. This factor is satisfied when a variety of individuals, including persons with personal relationships to the student and school district employees, work together to develop the student's IEP. Id. (finding the third Michael F. factor met where the student's IEP "involved both [the student's] individual teachers and the school district's administrators and counselors familiar with his needs in a highly coordinated and collaborated effort"); Z.C. , 2015 WL 11123347, at *7 (finding the third Michael F. factor met where school district employees and a variety of individuals with personal relationships to the student, including the student's parent and grandparents, participated in the student's ARDs and the school district implemented some recommendations made by the student's parent). Furthermore, IEP services are not offered in an uncollaborated and uncoordinated manner simply because disagreement exists between the parents and the school district as to which services should be provided. R.C. ex rel S.K. D.H. v. Keller Indep. Sch. Dist. , 958 F. Supp. 2d 718, 736-737 (N.D. Tex. 2013).
The record shows that J.M.'s IEP services were provided in a coordinated and collaborative manner by the key stakeholders. A variety of individuals worked together to develop J.M.'s IEP, including J.M.'s parents, some of J.M.'s teachers, and the District's representatives on J.M.'s ARD Committee. See, e.g. , J.1 at 2, 8, 11; J.2 at 1; J.5 at 6; A.R. at 3828-31; R.8 at 15-16 (the District conducted a vocational *599 assessment interview with J.M.'s science and chemistry teachers). J.M.'s parents attended the majority of J.M.'s ARD committee meetings. See, e.g. , J.1 at 8; J.5 at 6; R.8 at 53. The District implemented changes to J.M.'s IEP based on suggestions made by J.M.'s parents. See, e.g. , R.8 at 53; A.R. at 3763. Finally, J.M.'s parents and the District maintained communication regarding J.M.'s IEP over the summer leading up to the 2017-18 school year. R.10 at 1-28. For example, J.M.'s parents and the principal of the school discussed J.M.'s upcoming courses, additional math instruction, a summer schedule for dyslexia services, and AT training. Id. The tone of these conversations was collaborative and appeared to further the interests of J.M. Id. Accordingly, the Court finds that the third factor weighs in favor of the District.
iv. J.M. demonstrated positive academic and non-academic benefits.
The fourth factor weighs in favor of the District if J.M. demonstrated "positive academic and non-academic benefits." Michael F. , 118 F.3d at 253. Although no factor is dispositive, this fourth factor "is 'one of the most critical factors in [the Michael F. ] analysis.' " Alamo Heights , 703 F.3d at 814 (citing Houston Indep. Sch. Dist. v. V.P. ex rel Juan P. , 582 F.3d 576, 588 (5th Cir. 2009) ). Courts determine whether academic and non-academic benefits resulted from a student's IEP by looking to the progress or regress of the individual student, rather than by comparison to the academic progress achieved by the student's peers. Bobby R. , 200 F.3d at 349. The Bobby R. court found that academic benefits were shown where the student's test scores improved and the student progressed grade levels each year. Id. at 349-50. Notably, the Court found that the fourth factor was met where only an educational benefit had been demonstrated. Similarly, courts have found that the fourth factor is met where only non-academic benefits are demonstrated. A.B. v. Clear Creek Indep. Sch. Dist. , No. 4:17-CV-2382, 2018 WL 4680564, at *5 (S.D. Tex. Sept. 28, 2018).
As will be discussed below, J.M. demonstrated positive academic and non-academic results due to his IEP. However, Plaintiffs argue that J.M. did not demonstrate positive academic results because J.M.'s passing grades do not meet the Endrew F. standard, especially since J.M. was not graded in the same manner as other students. Pls.' Resp. at 27-29. Despite these contentions, Plaintiffs have provided no evidence indicating that the District modified J.M.'s curriculum or grading standards as is relevant to the present inquiry. Plaintiffs attempt to distinguish J.M.'s academic achievement from that of Rowley based on the 65% passing standard that was agreed to by J.M.'s parents and the District. Id. at 27. However, from the Court's reading of the record, this passing standard applied only to J.M.'s ability to participate in UIL activities, as opposed to J.M.'s advancement from grade to grade. J.1 at 25; J.4 at 24. Plaintiffs have failed to present evidence suggesting otherwise.
Further, the fact that J.M. received accommodations in his classes does not diminish the significance of his academic advancement. In fact, the Fifth Circuit has expressly held that a school district substantively complies with the IDEA where the student's IEP enables him to advance academically, "with accommodations for his disability, in a mainstream high school curriculum." Klein Indep. Sch. Dist. v. Hovem , 690 F.3d 390, 391 (5th Cir. 2012) (holding IDEA substantively complied with where student advanced through regular classes with accommodations, including correction of spelling errors without penalty and extra time for written work, for his difficulty in written expression).
*600 Under J.M.'s IEP, progress reports were sent to J.M.'s parents every three or six weeks-depending on the type of report-and demonstrated that J.M. was progressing toward success both academically and in coping with his dyslexia. R.8 at 41, 44. Although J.M. had some failing grades as a freshman, as a sophomore, J.M.'s grades had improved such that he did not receive a grade below an 80 for the entire school year, and he continued to advance from grade to grade. J.1 at 25; R.8 at 7-8. J.M. completed the same assignments as his classmates, kept up with his classmates academically, and earned the grades he received. A.R. at 3901, 3968-69, 3976-78. J.M. also demonstrated progress in his mastery of the basic academic skills mandated by the state. As of June 2016, J.M. had yet to meet the state standard on the STAAR EOC exams for Biology, Algebra I, and English I. J.1 at 21. By summer 2017, J.M. had passed the STAAR EOC English I and II, Algebra I, and Biology exams. R.19 at 17-19, 25. Further, J.M. demonstrated progress with his dyslexia due to the dyslexia services provided by the District under J.M.'s IEP. For example, J.M.'s ability to decode words had improved by the end of the 2016-2017 school year. A.R. at 3833-35. By the end of the summer in 2017, J.M. completed the DIP. Id. at 3861. Accordingly, the Court finds that the fourth factor weighs in favor of the District.
For these reasons, the Court finds that the District complied with the substantive requirements of the IDEA.
IV. Conclusion
Because of the foregoing reasons, the Court finds that the District complied with the procedural and substantive requirements of the IDEA. Accordingly, the Court will grant Defendant's Motion for Judgment on the Administrative Record and deny Plaintiffs' Motion for Summary Judgment. Pursuant to Federal Rule of Civil Procedure 58, the Court will issue its Final Judgment in a separate Order.

Referred to hereafter as R. --- or R. ---- at ----.

Referred to hereafter as J. --- or J. ---- at ----.

Referred to hereafter as A.R. at ----.

No goals were provided for Independent Living Skills because the ARD committee found that J.M. demonstrated independent living skills and therefore did not need support for post-secondary adult living. J.1 at 8.

Although J.M. scored below what was expected for his age, he still exhibited some strengths, such as identifying place value, solving single operation word problems, interpreting transformation of figures, and finding the perimeter. J.3 at 4. J.M. exhibited weaknesses in math problem solving, mathematic calculations, and math fluency. Id. at 5.

On March 7, 2017, the Texas Education Agency issued a letter to resolve a parental complaint that the hearing officer's decision in J.M.'s prior case had not been properly implemented by the District. Petitioners' Exhibit 43 at 2-3. The Texas Education Agency directed the District to take corrective action by convening an ARD meeting to revise J.M.'s Dyslexia IEP to include specific goals for the direct instruction of morphology and writing skills. Id. The District was also told to provide an updated documentation showing continued provision of the one-on-one compensatory dyslexia services. Id.

Plaintiffs cite to Caldwell Indep. Sch. Dist. v. L.P. to support their assertion; however, Caldwell merely applies Rowley 's two-prong test and mentions nothing about which prong the SEHO must apply first. See 994 F.Supp.2d 811, 818-21 (addressing procedural sufficiency before addressing substantive compliance).

Plaintiffs refer to a "transition evaluation." This is incorrect-the IDEA requires a "transition assessment " not an "evaluation." 20 U.S.C. § 1414(d)(1)(A)(VIII)(aa) (emphasis added). The Court will therefore use the term "assessment" and not "evaluation."

The Court will address whether the District infringed on J.M.'s parents' meaningful participation by allegedly misinforming them regarding transition services in Subsection (iv).

Plaintiffs argue the vocational interviews were not an assessment but fail to cite any authority, or provide any explanation, as to why that is the case.

For a more in-depth discussion on the appropriateness of using vocational assessment interviews in the transition planning process, see Section III(A)(iii) of this Order at pages 19-21.

The District notified J.M.'s parents of this field trip but it appears J.M. did not attend. A.R. 3910-11.

As Defendants state in their Response, even if an evaluation for AT was required, Plaintiffs failed to brief for the Court how this alleged procedural violation either (i) impeded the child's right to a FAPE; (ii) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE; or (iii) caused a deprivation of educational benefits. 20 U.S.C. § 1415(f)(3)(E)(ii) ; Pls.' Resp. at 18. Nonetheless, the Court agrees with the SEHO's finding that even if an evaluation was required, "[J.M.'s] IEPs nevertheless addressed Student's academic needs with appropriate instructional accommodations as support." A.R. at 43.

Because the Court finds the District did not commit any procedural violations of the IDEA, it need not address whether any procedural violation (i) impeded the child's right to a FAPE; (ii) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE; or (iii) caused a deprivation of educational benefits.

Plaintiffs advance this misapplication despite their concession that the Michael F. factors serve as indicators of an IEP's substantive appropriateness that must be considered with the Endrew F. opinion. Pls.' Resp. at 6.

See also C.G. Waller Indep. Sch. Dist. , No. 4:15-CV-00123, 2016 WL 3144161, at *6-7 (S.D. Tex. June 6, 2016), aff'd sub nom.; C.M. v. Warren Indep. Dist. , No. 9-16-CV-165, 2017 WL 4479613, at *12 (E.D. Tex. Apr. 18, 2017) ; Shafi v. Lewisville Indep. Sch. Dist. , No. 4:15-CV-599, 2016 WL 7242768, at *6 (E.D. Tex. Dec. 15, 2016) (each finding the child's IEP was sufficiently individualized where the IEP was based on multiple assessments and evaluations performed on the child and IEP strategies were discussed with the child's parent).